[Cite as *Siegel v. Univ. of Cincinnati College of Medicine*, 2024-Ohio-4946.]

**IN THE COURT OF CLAIMS OF OHIO**

| | |
|---|---|
| FRANCES B. SIEGEL, Admr., etc., et al. | Case No. 2009-09531JD |
| Plaintiffs | Magistrate Holly True Shaver |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| UNIVERSITY OF CINCINNATI COLLEGE OF MEDICINE | |
| Defendant | |

{¶1} This case was tried to the court on November 6-9, 2023, on the issues of liability and damages for plaintiffs' claims of spoliation of evidence and fraud. For the following reasons, judgment is recommended in favor of defendant.

**Procedural History**

{¶2} This case has a lengthy history. The underlying facts in this case involve plaintiffs' decedent, Jessica Siegel ("Jessica"), who died at the age of 16 after she underwent brain surgery at Good Samaritan Hospital in Cincinnati, Ohio in August 2006. Plaintiffs filed lawsuits in 2008 and 2009 in the Hamilton County Court of Common Pleas regarding Jessica's death and the harvesting of her eyes after her death. Plaintiffs filed the current case in this court on December 16, 2009. This case was stayed pending the connected actions in Hamilton County. In 2013, the undersigned magistrate conducted an evidentiary hearing on the civil immunity of Dr. Andrew Ringer, the physician who performed Jessica's brain surgery. This court found that Dr. Ringer was entitled to personal immunity and that he did not act in a willful, wanton, or reckless manner during his care and treatment of Jessica. The decision on the immunity determination was upheld by the Tenth District Court of Appeals, and the Supreme Court of Ohio declined to hear an appeal. The proceedings in Hamilton County resulted in a finding that plaintiffs' claims were barred by the applicable statutes of limitations and/or that they were barred by the doctrine of res judicata. Thereafter, this court granted summary judgment in

defendant's favor, finding that plaintiffs' claims were barred by the applicable statutes of limitations. The Tenth District Court of Appeals affirmed this court's decision that plaintiffs' claims of medical malpractice, wrongful death, and breach of contract about the autopsy were barred by the applicable statutes of limitations. However, the Tenth District Court of Appeals reversed and remanded the portion of this court's decision regarding plaintiffs' claims for fraud and spoliation of evidence because it found that those claims were not medical claims, and that they were not barred by the applicable statute of limitations based upon the evidence in the record at that time.[1] After another series of motions, this court found that issues of both material fact and credibility existed regarding the testimony of Daniel Siegel, Dr. Andrew Ringer, Attorney Paul Scott and Attorney Joseph Shea. The case proceeded to trial on the remaining claims of fraud and spoliation of evidence. Upon review of the evidence now in the record, the testimony of all witnesses at trial including deposition testimony, and the parties' post-trial briefs and arguments, the magistrate makes the following findings of fact and conclusions of law.

**Underlying Undisputed Facts Regarding Jessica's Medical Condition and Procedures, Taken From Medical Records and Testimony of Witnesses**

{¶3} When she was nine years old, Jessica was diagnosed with arteriovenous malformation (AVM), after she had experienced a series of severe headaches and sensitivity to light. AVM occurs in the brain when certain arteries connect directly to veins, which results in high pressure, high flow blood from the arteries going directly into the low-pressure system of the veins without having gone through the filter of the capillaries. In some instances, the veins cannot withstand the pressure and they rupture and cause bleeding in the brain or stroke-like symptoms. A nidus is the component of the AVM in which the abnormal artery to vein connections are made and the immediately surrounding vasculature. There were two different niduses in Jessica's brain. Jessica's AVM was large and was considered either a 4 or a 5 on the Spetzler- Martin grade system, a scale used to measure AVMs for surgical resection.

---

[1] *Siegel v. State*, 2020-Ohio-4708, ¶ 1 (10th Dist.).

{¶4} Jessica was initially treated at Cincinnati Children's Hospital by Dr. John Myseros, head of the neurosurgery department. Jessica successfully underwent three embolizations and one radiosurgery from age 9 to 15 with Dr. Myseros. Trial transcript, p. 62. The Siegels were informed that after the radiosurgery, it might take 18 months to four years to see any results. Jessica underwent annual MRIs with Dr. Myseros to make sure the AVM did not get any worse. Dr. Myseros referred Jessica to Dr. Andrew Ringer because Dr. Myseros was moving to Washington, D.C. Jessica was asymptomatic when she was referred to Dr. Ringer.

{¶5} After consulting with Dr. Ringer in March 2006 and discussing her condition, a staged embolization was scheduled for July 2006. Plaintiffs' Exhibit 55. Surgical resection of the AVM was never planned for Jessica; Dr. Ringer's plan was embolization and then radiosurgery to reduce the size of the niduses. The medical records reflect that Dr. Ringer had a lengthy discussion with Jessica and her parents about the risks and benefits of observation, radiosurgery, embolization, and surgery; and that Dr. Ringer had described recent improvements in embolic technique and materials, such as a new type of glue known as "Onyx," that had dramatically improved the ability to treat AVMs and subsequently improve the safety and efficacy of radiosurgery or surgery. Plaintiffs' Exhibit 3, p. 131/135.

{¶6} In July 2006, Jessica underwent the first embolization surgery performed by Dr. Ringer. Plaintiffs' Exhibit 4A. Embolization surgery is performed by moving a guidewire through the brain and using a substance, known as Onyx, to glue shut a portion of the artery or vein. During the July surgery, there was one complication: an AVM pedicle branch perforation, but it was asymptomatic and did not cause any problems at the time. Dr. Ringer sent a letter to Jessica's pediatrician stating that the procedure was uncomplicated. Plaintiffs' Exhibit 15. Jessica's mother and the administrator of her estate, Frances Siegel, testified that Dr. Ringer stated that he was able to block off 20 percent of the veins that were part of the problem, and that another embolization procedure needed to be scheduled within four weeks. Trial transcript, p. 545. The next surgery was scheduled for August 14, 2006.

{¶7} According to Jessica's parents, plaintiffs Daniel and Frances Siegel, on the morning of the scheduled August surgery, Jessica did not want to go to the hospital, and

she locked herself in her bedroom, stating that she had a bad dream about the procedure. After a discussion with her parents, Jessica got into the car with them to go to the hospital, but she was still fearful of going forward with the surgery. Jessica's parents advised her that the surgery was in her best interests. Plaintiffs regret that they made this decision for their daughter, and Frances testified that she has unresolved guilt about this. Trial transcript, p. 547. Frances Siegel also testified that at an earlier time when Jessica was getting her temporary driving permit at the Bureau of Motor Vehicles, Jessica stated that she did not want to be an organ donor. Trial transcript, p. 561.

{¶8} During the August 14, 2006 surgery, two complications occurred, which are documented in the medical records. Defendant's Exhibit A, p. 423-427. First, there was extravasation of contrast dye. *Id.*, p. 425. This typically occurs when there has been a perforation of a vein or artery. Second, there was a "filling defect" in the right middle cerebral artery, which appeared to have been caused by the glue getting into an artery which was not intended for embolization. *Id.* Although there were complications, a form letter from Dr. Ringer to Jessica's pediatrician was issued, stating that the procedure was uncomplicated. Plaintiffs' Exhibit 16. Because of the potential of a blood clot, Dr. Ringer administered heparin, a blood thinner, after the filling defect to prevent any clot from causing a stroke. After surgery, Dr. Ringer informed plaintiffs that there had been complications during the procedure. According to Frances, Dr. Ringer said that he had nicked a healthy vein and he plugged it up and everything was fine, and Jessica was resting comfortably. Trial transcript, p. 548. According to Daniel, Dr. Ringer told him that he had nicked a good artery and there was a bleed but that he had plugged it up and stopped it and told them not to worry. Trial transcript, p. 77. After surgery, Jessica was awakened and was able to speak with her parents. Frances stayed with Jessica overnight and Daniel and Jessica's older sister, Kristen, went home. Jessica had a sudden, severe headache, cried out in pain, and then suffered a stroke. She was placed in a medically induced coma for the rest of her hospital stay.

{¶9} On August 15, 2006, a CT scan of Jessica's brain showed that a hematoma had developed and had increased in size. Frances testified that by August 15, 2006, she was aware that there was a recognized brain bleed in Jessica's head, which increased in size by August 16, 2006. Trial transcript, p. 551. Daniel testified that Dr. Nicholas Levine

told him that Jessica had a brain bleed and had been placed in a medical coma; that a catheter had been placed in her brain; and that they were watching her and running tests. Trial transcript, p. 78. Daniel testified that Dr. Levine told him that it was a dangerous brain bleed and that he would keep the Siegels informed of Jessica's condition. *Id.* Jessica's intercranial pressures (ICP) increased throughout the days following the surgery and Dr. Ringer performed a craniectomy to relieve the pressure on August 18, 2006. Days after the craniectomy, it was decided that Jessica should undergo a tracheostomy to provide an airway for continued respiratory support. Dr. Bradley Bobbitt performed the tracheostomy on August 23, 2006. Within hours of the tracheostomy, Jessica's temperature increased to 108 degrees, she went into a code blue, and died. Jessica's sudden death was a shock to her family, her treating physicians, and the medical team.

{¶10} The medical records show that multiple CT scans of Jessica's brain were taken during her hospital stay. A CT scan was performed after the embolization procedure on August 14. Defendant's Exhibit B, p. 012, 108, 124. Another CT scan was performed on August 15 after Jessica's change in status. Defendant's Exhibit B*.,* p. 012, 098*.* A repeat head CT scan was performed on August 15, prior to Jessica having a seizure. Defendant's Exhibit B, p. 012*.* Another head CT scan was taken on August 15 after Jessica had suffered a seizure. *Id.* A repeat head CT scan was conducted on August 16. Defendant's Exhibit B, p. 012*,* p. 110*.* Another head CT scan was conducted on August 17. Defendant's Exhibit B., p. 013, 117. Another CT scan of her head was performed on August 18 before the craniectomy. Defendant's Exhibit B, p. 013*.* Another CT scan of her head was performed on August 19. Defendant's Exhibit B., p. 014, 122. Another CT scan of her head was performed on August 21. Defendant's Exhibit B, p. 130. A final CT scan of her head was performed on August 23 at 10:53 a.m. Plaintiffs' Exhibit 5.k Disk 14.

{¶11} The claims for spoliation of evidence and fraud are based upon events that occurred following Jessica's death. It is undisputed that Dr. Ringer approached Daniel Siegel and obtained his permission for the pathology department at University of Cincinnati Hospital to perform an autopsy. Dr. Ringer requested permission for an in-house autopsy based on his assertion that the Hamilton County Coroner's Office had been contacted and declined to perform an autopsy. Daniel Siegel signed an

authorization form for a complete autopsy before he left the hospital on the night of Jessica's death. When the autopsy report was provided to the Siegels four months later, it revealed that Jessica's head and brain had not been examined during the autopsy.

{¶12} Plaintiffs allege that Dr. Ringer lied when he told the Siegels that the coroner did not accept the case, and that he intentionally excluded the brain and head from the autopsy to destroy any evidence that an autopsy of Jessica's brain would have provided to support their claims for medical malpractice and wrongful death. Plaintiffs assert that examination of the brain was critical in Jessica's case, because Dr. Ringer had recently performed brain surgery on her, and that excluding her brain from the autopsy disrupted any medical malpractice or wrongful death case they could have pursued. Plaintiffs also argue that when they met with Dr. Ringer on January 17, 2008, more than one year after Jessica's death, Dr. Ringer lied to them again when he claimed not to know why Jessica's brain had not been examined as part of the autopsy. Plaintiffs assert that they first learned that Dr. Ringer had limited the autopsy himself when they took the deposition of nurse Amie Smith on December 17, 2008, in litigation against the eye-harvesting company.

**Events After Jessica's Death**

{¶13} In the immunity determination eleven years ago, the undersigned magistrate found that the Hamilton County Coroner's Office had been contacted by Jessica's medical team and that the coroner declined to perform an autopsy on Jessica. This finding was based upon testimony and the medical records, including a note written by Dr. Nicholas Levine, who was the chief resident during Jessica's hospitalization. Plaintiffs' counsel proffered an affidavit from the coroner's office at the evidentiary hearing, but it was not admitted into evidence because it had not been disclosed to opposing counsel prior to the hearing, and no witness from the coroner's office was called to testify.

{¶14} At trial, plaintiffs presented the deposition testimony of Andrea Hatten, office administrator for the Hamilton County Coroner's Office. Plaintiffs' Exhibit 27. Hatten testified that all deaths reported to the coroner's office were documented by way of computer in 2006. Hatten Deposition., p. 8. After running a computer search for reported deaths from August 23 to August 24, 2006, Jessica's name was not found. *Id.*, p. 53. Hatten also testified that the code "NCC" which stands for non-coroner's case, a case

that was not accepted by the coroner, means that the coroner would not sign the death certificate. *Id.*, p. 13. Hatten testified that the phone line for a potential coroner's case is always monitored. *Id.*, p. 17. According to Hatten, the coroner's office has never kept phone records of incoming calls, but the person on duty would document the information if a death were reported. *Id.*, p. 20-22. Hatten explained, "When the calls would come in – well, there are cases that qualify as being reportable to our office, and it's up to, depending on the circumstances of the death and the on-call pathologist, of which those circumstances would be reported to, as to whether or not it would be accepted as a coroner's case." *Id.*, p. 29. Hatten stated: "If we would have accepted jurisdiction in that death, it would be recorded in here, and if it was reported to us, it would have been recorded in here." *Id.*, p. 32-33. Hatten also testified that a reported death is a non-coroner's case if it does not meet the criteria of being an unnatural death. *Id.*, p. 35. Hatten explained that the coroner's office always performs a complete autopsy, not a limited one. *Id.*, p. 44. Hatten stated that from her examination of the records at the Hamilton County Coroner's Office for the period of August 23-24, 2006, no record of Jessica Siegel exists. *Id.*, p. 53.

{¶15} Hatten provided five examples of deaths that had been reported to the Hamilton County Coroner's office on August 23-24, 2006. *See* Exhibits D-1 through D-5 of Hatten's Deposition. One death was reported from the Clermont County Coroner's Office for an individual who was found dead in her home. This death was classified as an out of county case. The immediate cause of death was listed as intracerebral and brain stem hemorrhages. The second death was classified as an autopsy case, for an individual who was found dead at his residence. The immediate cause of death was listed as asthma, and it was classified as a natural death. The third death was for an individual who died in the emergency room at Mercy Franciscan-Western Hills. This individual was pronounced dead by an emergency room doctor, his death was classified as a non-coroner case, and there is no immediate cause of death listed. The fourth individual's death was listed as "storage bodies" for an individual who died as an inpatient at Hospice of Cincinnati and had donated her body to the University of Cincinnati Department of Anatomy. No cause of death was listed. The fifth individual died at the emergency room at Mercy Hospital Anderson. His case was classified as a non-coroner case, and no

immediate cause of death was noted.  Hatten testified that her office would not perform an autopsy if a physician, not in the coroner's office, was signing the death certificate. Hatten Deposition, p. 15.  Based upon Hatten's testimony, the magistrate finds that the Hamilton County Coroner's Office has no record that Jessica Siegel's death at Good Samaritan Hospital on August 23, 2006, was reported to its office.  Notably, however, the two examples provided of deaths that were reported by emergency room physicians were classified as non-coroner cases by the Hamilton County Coroner's Office, and no cause of death was listed for those individuals.

{¶16} In contrast to that testimony, defendant filed the deposition of **Amie Smith**, R.N., with attached exhibits.  Defendant's Exhibit M-11.  Smith's deposition was taken on December 17, 2008, in plaintiffs' lawsuit against LifeCenter Organ Donor Network, et al., in the Hamilton County Court of Common Pleas, because plaintiffs asserted that Jessica's eyes were harvested for transplantation after her death without plaintiffs' consent.  Smith's deposition was presented at the immunity hearing eleven years ago but the exhibits from her deposition were not included at that time.  Smith testified that she began caring for Jessica on August 16, 2006, after Jessica had been placed on a ventilator.  Smith Deposition, p. 12, 28.  Smith also cared for Jessica on August 23, 2006, the day that she died.  *Id.*, p. 13.

{¶17} Smith testified that when a death occurs, she is responsible for completing a "death packet," which contains three forms:  1) a release of body form; 2) a referral for LifeCenter, and 3) the autopsy request form.  Smith Deposition, p. 37.  Smith explained that she handwrites information and gives it to the unit coordinator, who enters it into a computer to generate the release of body form.  *Id.*, p. 39.  Of note, on the release of body form, it states: "Autopsy? Yes (If a physician requested autopsy is to be performed, please obtain the appropriate signature and complete the form #L-202 8-01.  Place this completed form in the chart and send the chart to the laboratory.)  Coroner's case:  **N**." (Emphasis added.)  Smith Deposition, Exhibit 5, p. 56/63.

{¶18} The third form in the death packet is the most relevant to this case.  The autopsy authorization form is contained in the record in multiple places.  Exhibits 6 and 7 to Smith's deposition; Defendant's Exhibit A, p. 495; Plaintiffs' Exhibit 6.  The heading on the form states "Department of Pathology."  Smith testified that after Dr. Ringer came

back from talking to Jessica's family, Dr. Ringer informed her that the family wanted an autopsy.  Smith Deposition, p. 46.

Smith stated the following about what she remembers:

The family was in the patient's room.  They came out, stated they wanted to leave.  I had not completed any of the forms that I had needed to do at that time.  I then handed – I told Mr. Siegel that I have not completed the forms that require his signature.  He said he didn't care and they wanted to leave.  So he signed this form without it being filled out.

Smith Deposition, p. 45.

The department of pathology form contains the following information:

**AUTHORIZATION FOR AUTOPSY.**

I (We) request and authorize the physicians and surgeons in attendance at the Good Samaritan Hospital to perform a complete autopsy on the remains of _____ and I (we) authorize the removal and retention or use for diagnostic, scientific or therapeutic purposes of such organs, tissues, and parts as such physicians and surgeons deem proper.

The following post-mortem examination shall be made. **(CHECK ONLY ONE)**

1. Brain _____
2. Thorax _____
3. Heart _____
4. Lung _____
5. Abdomen _____
6. Limited to thorax and abdomen (no head) _____
7. Specific abdomen organ (state) _____
8. Complete (including head and brain) _____

I (We) wish the remains to be released to (Name of undertaking establishment) _____ (City) _____ (State) _____

I (We) represent that I am (we are) the (relationship) _____ of the deceased and entitled by law to control the disposition of the remains.

**SEE REVERSE SIDE FOR PERSON AUTHORIZED TO SIGN THIS FORM.**

Signed:       (Signature     and     relationship     to     deceased) _____

Witnesses:

_____

_____

Name      of      Person      obtaining      Authorization:

_____

{¶19} Smith testified that she witnessed Daniel Siegel sign the form. Smith Deposition, p. 45. Then, after the Siegels left the hospital, Smith began to fill out the form with Dr. Ringer. *Id.*, p. 47. When she got to the portion where it states which type of autopsy, she check-marked number 8, "Complete (including head and brain)." *Id.* She stated it aloud when she check-marked it. *Id.* Dr. Ringer was standing to the right of her. *Id.* He stated, "No, I do not want a complete head and brain. That is not why she died." *Id.* Smith then crossed a line through number 8, wrote "ERROR, AS 8/23/2006 2030," checked the line for number 6 (Limited to thorax and abdomen (no head)) and wrote "and muscle biopsy for malignant hyperthermia." *Id.*, p. 47, 50. She also added: "see order sheet verbal order Dr. Andrew Ringer requested" and signed her name. *Id.*, p. 51. Smith also signed as a witness and as the name of the person obtaining authorization. Smith Deposition Exhibit 6. Smith filled out the other portions of the form as shown in the exhibit, including the information from Jessica's medical records and the funeral home information. *Id.*

{¶20} Smith testified that she was not present for the discussion about an autopsy with the Siegels; that she did not know what the family wanted with regard to an autopsy; that Dr. Ringer never told her that he had told the family that the brain would be excluded from the autopsy; and that she did not tell the Siegels that the autopsy would be limited. Smith Deposition, p. 45-46, 51, 71. Smith also testified that when she spoke to the employee from LifeCenter to report Jessica's death she reported it as a cardiac death and that the cause of death was cardiac arrest. Smith Deposition Exhibit 8, p. 60/63. The call she made to LifeCenter was recorded, and during Smith's deposition, the recording was played, and Smith made corrections to the written transcription that counsel for plaintiffs had typed and marked as Exhibit 8 to Smith's deposition. Smith Deposition, p. 73-79. Other than the phone call, Smith did not have any contact with LifeCenter and did not know the details of whether plaintiffs consented to any organ donation, because that would be handled by LifeCenter staff. *Id.*, p. 82-83.

{¶21} Part of the phone call transcription shows that when Smith was asked whether there was going to be an autopsy or a coroner's case, she stated, "we are talking with the coroner right now." *Id.*, p. 79, Smith Deposition, Exhibit 8, p. 62/63. Smith testified that in her nursing practice, a patient is a potential coroner case if they have died within 24 hours of admission, or they have died 24 hours after a surgical procedure, such as a tracheostomy. *Id.*, p. 79-80. Smith also testified that it is her practice to have the physician contact the coroner, and in this case, she asked a physician to contact the coroner, but she was not sure which physician she asked. *Id.* Smith testified that she has contacted the coroner herself in other cases, and that she would give all the demographic information and history of the patient and then the coroner's office would determine whether the coroner's office wanted it to be a coroner's case. *Id.*, p. 80-81.

{¶22} **Dr. Nicholas Levine,** a neurosurgeon, was the chief resident who cared for Jessica during her August 2006 admission to Good Samaritan Hospital, while Dr. Ringer was the attending physician on Jessica's case. Trial transcript, p. 776, 777. Dr. Levine is currently licensed in California. *Id.*, p. 774. He spent seven years at the University of Cincinnati Mayfield Clinic neurosurgery program. *Id.* He was a chief resident in August 2006 and was in his seventh year of the residency program at that time. *Id.*, p. 774-775. According to Dr. Levine, all notes in the medical record were handwritten in 2006, as

opposed to being electronic. *Id.*, p. 775. However, discharge summaries were dictated and transcribed. *Id.*

{¶23} Dr. Levine remembers Jessica's case. *Id.*, p. 777. Dr. Levine testified that he wrote the neurosurgery note contained on page 71 of Defendant's Exhibit A, including the death note. Trial transcript, p. 781-784. The last two lines of the death note state: "Patient pronounced dead at 7:08 pm. Appropriate parties including family and coroner notified." *Id.*, p. 784; Defendant's Exhibit A, p. 71. Dr. Levine signed the death note. *Id.* According to Dr. Levine, in the case of any death on the neurosurgery service, it was customary for the resident to call the coroner and notify the coroner of a death. Trial transcript, p. 785. Dr. Levine testified that he would not have recorded that he called the coroner if he had not done so. *Id.* Dr. Levine testified that the medical record is a legal record, and that he would not write anything in a medical record that is not appropriate because he could be subject to sanctions or lose his medical license for inappropriate chart documentation. *Id.*, p. 785-786. Dr. Levine testified that he was not part of any scheme to falsely say that he notified the coroner but did not. *Id.*, p. 786.

{¶24} Dr. Levine testified that he dictated the discharge summary for Dr. Ringer. *Id.*, p. 786-789; Defendant's Ex. A, p. 163-168. Dr. Levine stated that it was routine for the resident to dictate the discharge summary, and the only reason the attending physician would do so is if there was no resident present or if the attending physician was taking care of the patient separate from the residents. Trial transcript, p. 787. Dr. Levine testified that he dictated the discharge summary based upon Jessica's medical records and the care that he provided to her. *Id.*, p. 787-788. The discharge summary states: "The appropriate parties including the patient's family and the coroner were notified. The coroner declined an autopsy; however, at the physician's request and the patient's family's approval an autopsy will be obtained." Defendant's Exhibit A, p. 168. Dr. Levine testified that this is a truthful statement. Trial transcript, p. 788. Dr. Levine testified that he called into the dictation service, and that he alone dictated the discharge summary. *Id.*

{¶25} Dr. Levine testified that when he called the coroner's office, he remembers being near the Intensive Care Unit (ICU) and the nurses' station. *Id.*, p. 789. Dr. Levine did not remember which nurses were present but testified that multiple nurses were at the

nurses' station when he made the call.  *Id.*  Dr. Levine testified that he called the coroner and discussed the case with the coroner's office to see if they were going to take the case. *Id.*

{¶26} Dr. Levine stated that throughout his residency, it was a regular occurrence for him to contact the coroner's office.  *Id.*, p. 792.  Plaintiffs' Exhibit 50 states the following:

> ***At Good Samaritan Hospital:***  The attending physician is ultimately responsible for calling the Coroner's Office.  The Coroner is to be called by the attending physician or the resident taking care of that patient.  In the case of patients without resident coverage, the attending physician will be responsible for the call, regardless of who actually pronounces the patient.  Nursing is responsible for, or having the unit coordinator fax to the Coroner's Office any demographic data needed.
>
> . . .
>
> Coroner's Cases

1) Evaluate patient to determine if a coroner's case.  The Coroner's Office is notified of the following:

- accidental death (motor vehicle crash or industrial accident)
- homicidal death
- suicidal death
- abortions (criminal or self-induced)
- sudden death
- therapeutic complications
- any case in which surgical intervention has occurred during the current admission
- any death due to fire or burns
- any death in which there is a doubt, question, or suspicion
- any death within 24 hours of hospital admission
- all stillborn infants where there is suspected or actual injury to the mother.

{¶27} When shown Plaintiffs' Ex. 50, Dr. Levine explained that the coroner is to be called by the attending physician or the resident taking care of the patient. Trial transcript, p. 794. Dr. Levine testified that he was the resident taking care of Jessica, and he followed hospital guidelines by calling the coroner. *Id.*

Dr. Levine explained that:

The coroner's office usually had an attendant that would answer the phone. You would discuss the details of the patient and their death. All the information was garnered from that attendant. And then you were told that that would be discussed with the coroner and if the case were to be taken, you would be called back. Otherwise, the coroner did not take the case. *Id.*, p. 796.

{¶28} Although Hatten testified that there is no record from the Hamilton County coroner's office, Dr. Levine testified that he did make the call, which is documented in his dictation at the time, and that he did not receive a call back from the coroner's office. *Id.*, p. 796-798. Dr. Levine testified that he was not involved in Dr. Ringer's discussions about the autopsy with the family. *Id.*, p. 798.

{¶29} **Daniel Beckman, M.D.,** was the pathologist who performed the autopsy on Jessica. Dr. Beckman's deposition was taken on January 19, 2009, in litigation against Lifecenter Organ Donor Network. Plaintiffs' Exhibit 54. Dr. Beckman testified that in performing an autopsy, his job is to "analyze the tissues and come up with a reasonable cause of death. That's the function of the autopsy. We can't always come up with the cause of death, but we are looking at anatomic tissues, and we prepare slides, and that's how we come to our conclusions." Beckman Deposition, p. 26-27. Dr. Beckman testified that he performed approximately three to five autopsies per year, besides performing his other pathology duties, and that the incidents of autopsies had dropped off quite a bit. *Id.*, p. 27.

{¶30} Dr. Beckman first saw the autopsy consent form on the morning of the autopsy. *Id.*, p. 33. The date of the autopsy was August 24, 2006. *Id.* Before he began the autopsy, Dr. Beckman spoke to Dr. Ringer via telephone to see if there was anything unusual or if Dr. Ringer wanted him to look for anything special. *Id.*, p. 36. Dr. Beckman talked to Dr. Ringer about Jessica's history, what happened to her, and Dr. Ringer's

concern for malignant hyperthermia.  *Id.*, p. 37.  Dr. Beckman testified that the majority of the time, he performs a complete autopsy, including the chest, abdomen, and brain.  *Id.*, p. 38.  When asked from a pathologist's standpoint, why he would want to do a complete autopsy, including the head and brain, he testified, "I think you have to analyze the whole body, and that's the only way to do it."  *Id.*, p. 38.

{¶31} Dr. Beckman testified that the authorization for an autopsy gave him permission to perform an autopsy on the thorax and abdomen and test the muscle tissue for malignant hyperthermia.  *Id.*, p. 41.  He noted that he does not routinely take muscle tissue as part of a "normal" autopsy.  *Id.*  When asked why, in his discussions with Dr. Ringer, the head and brain were excluded during the autopsy, Dr. Beckman testified that, "Dr. Ringer stated the intercranial pressure was normal, so he did not want the brain autopsied."  *Id.*, p. 42-43.  When asked what intercranial pressure has to do with determining how Jessica died, Dr. Beckman stated, "I really don't know."  *Id.*, p. 43.  He agreed that a normal intercranial pressure did not rule out a cause of death within the brain itself.  *Id.*, p. 43.  He testified that it was Dr. Ringer's "call" for what he wanted to be autopsied, and that even though it might be unusual, it was Dr. Ringer's decision to make.  *Id.*, p. 44.  Dr. Beckman explained that even though he would want to examine the brain in determining a cause of death, it was not his prerogative to ask Dr. Ringer for different permissions.  *Id.*, p. 45.  Dr. Beckman testified that Dr. Ringer did not discuss the wishes of Jessica's parents during the conversation he had with him.  *Id.*

{¶32} Dr. Beckman agreed with the statement, "available data from the medical literature shows that most pathologists believe that the complete autopsy remains the criterion standard and that limitations on the autopsy procedure greatly increase the risk of incomplete or inaccurate results."  *Id.*, p. 52.  Dr. Beckman testified that if he had been permitted to examine the brain, he would have removed the brain and probably would have called the consulting neuropathologist, Dr. Kendler, at the University of Cincinnati.  *Id.*, p. 54.  Dr. Beckman stated that if the brain were removed, it would be placed in a container of formaldehyde for seven to fourteen days to "fix" it, which would yield a better microscopic examination of the brain, because the brain is a very gelatinous type of organ.  *Id.*, p. 55.  If Dr. Beckman had removed the brain, the goal would have been to see if there was any hemorrhage in the brain, document the size of the abnormal AVM blood

vessels, and look for any blockages in any of the major arteries of the brain. *Id.*, p. 56-57. Dr. Beckman testified that without a complete autopsy, including the brain, he cannot determine what the cause of death was with medical certainty. *Id.*, p. 58. He testified that he thought the pneumonia certainly contributed to Jessica's death. *Id.*, p. 58-59. When asked, "Are you able to give an opinion as, within medical probability, why Jessica died without an examination of her brain, given her clinical picture here?" he replied, "All I can say is that the lung disease contributed to her death. I don't know what part of the central nervous system, hemorrhage, postoperative complications, etc., contributed to her death." *Id.*, p. 59. He continued, "That is a decision that has to be made by the clinicians that were taking care of her, with contribution from the autopsy." *Id.* He stated that if Jessica's body were to have been exhumed in 2009, her brain would have been decomposed and would not have contributed to evaluating the cause of her death. *Id.*, p. 59-60. In Dr. Beckman's professional opinion, it would have been of use to examine Jessica's brain during the autopsy. *Id.*, p. 61. He had no opinion on whether it was unusual in this type of case to not examine the brain during an autopsy. *Id.*

{¶33} Dr. Beckman recalled that Dr. Ringer also wanted to rule out a pulmonary embolism, and that Dr. Beckman found no evidence of a pulmonary thromboembolism anywhere in Jessica. *Id.*, p. 70-73. Dr. Beckman noted that the right pleural space contained approximately 50 to 60 cc's of straw-colored fluid, as did the left space. *Id.*, p. 73. He explained that finding is consistent with pneumonia. *Id.* Dr. Beckman noted that Jessica's right lung weighed 950 grams and the left lung weighed 880 grams, which meant that both lungs were heavy and that finding was consistent with either fluid or pneumonia. *Id.*, p. 75. He noted that the pleural surfaces were somewhat congested and hemorrhagic, which meant that the lungs were filled with fluid more than air, and that they were more reddish than usual. *Id.*, p. 75. Dr. Beckman testified that the autopsy of Jessica's lung tissue showed necrotizing areas which are caused by a severe form of pneumonia. *Id.*, p. 82-83. In the Preliminary Anatomic Diagnosis of the autopsy report, Dr. Beckman wrote: "1. Lungs with lower lobe congestion and possible consolidation, right – weight, 950, left, weight, 880." Plaintiffs' Exhibit 7, p. 4. Dr. Beckman wrote that as his first finding because it was his most significant finding. Beckman Depo., p. 86-87. His second finding was "bilateral pleural effusions"; his third finding was "status post right

craniectomy for intracerebral hematoma (08-18-2006)", which was not a pathological finding but was important to the diagnosis. *Id.*, p. 87. The fourth finding was "status post tracheotomy (08-23-2006)." Plaintiffs' Exhibit 7, p. 4. Dr. Beckman testified that he was not contacted or consulted about the certificate of death or the cause of death listed thereon. Beckman Deposition, p. 91.

{¶34} When asked, "if the coroner's office had been contacted in this case and did not accept it, would this have been a case that you would have gotten on the phone and asked them [the coroner's office] to review it" Dr. Beckman stated, "I doubt it, no. . . . I don't think there was anything unusual that – it was very unusual and very tragic that she passed away, but I – it was my impression, reading over the chart at the time of the autopsy, that nothing unusual was done or had happened." *Id.*, p. 98. Dr. Beckman agreed that Dr. Ringer's order for an autopsy with muscle biopsy, "PE versus malignant hyperthermia," did not put any limitations on the autopsy, but that Dr. Beckman did not have permission to autopsy the brain because the autopsy authorization did not permit him to do so. *Id.*, p. 112-113; 104, 41, 123. Dr. Beckman testified that the results of the tissue that was sent to Pittsburgh to be tested for malignant hyperthermia came back around November 12, 2006. *Id.*, p. 116. The completed autopsy report was available on December 8, 2006. *Id.*

**Dr. Andrew Ringer**

{¶35} On cross-examination, Dr. Ringer testified that he began performing endovascular surgeries as an attending physician in 2001 and had performed a handful of procedures as an attending physician on AVMs that were rated as a 4 to 5 on the Spetzler-Martin grade system before he treated Jessica. Trial transcript, p. 174-176. Jessica was Dr. Ringer's first AVM procedure that resulted in death. Trial transcript, p. 177. Dr. Ringer testified that the tracheostomy was performed on August 23 with his consent, even though Jessica had a fever that day. Trial transcript, pp. 199-200.

{¶36} According to Dr. Ringer, once Jessica had died, he felt obligated to report Jessica's death to the Hamilton County Coroner.  Trial transcript, p. 201.  Dr. Ringer testified that he did not personally contact the coroner's office.  Trial transcript, p. 202.  Dr. Ringer testified that Dr. Levine wrote the death note, which is something that is typically written by the resident.  Trial transcript pp. 202-203; Plaintiffs' Exhibit 18, death note, p. 71.  Dr. Ringer also testified that he saw Dr. Levine make the call to the coroner's office and explained that he and Dr. Levine were both in the ICU at the time.  Trial transcript, p. 203.  Dr. Ringer had no explanation why the coroner's office does not have a record of the reporting of Jessica's death.  *Id.*

{¶37} When shown Plaintiffs' Exhibit 17, the discharge summary, Dr. Ringer noted that it lists his name as the dictating doctor.  Trial transcript, p. 203.  However, the last page of the document says it was dictated by Dr. Levine.  Trial transcript, p. 204.  Dr. Ringer testified that it was the typical practice to have the resident dictate the discharge summary, and that Dr. Levine's signature appears on the last page.  *Id.*  Dr. Ringer testified that he signed off on the discharge summary electronically, as stated on the last page.  *Id.*  Dr. Ringer testified that Dr. Levine told him that the coroner declined the case.  Trial transcript, p. 204-205.

{¶38} Dr. Ringer testified that after Jessica's death, he approached Daniel Siegel to discuss an autopsy.  Trial transcript, p. 205.  Dr. Ringer testified that he was not present when Daniel Siegel signed the autopsy consent form; he was in the ICU.  Trial transcript, p. 206; Defendant's Ex. A, pp. 494 and 495.  Dr. Ringer explained that Nurse Smith presented the form to him after Daniel Siegel had signed it, and that Dr. Ringer signed it as a witness after Daniel Siegel had left the hospital.  Trial transcript, p. 206.  Dr. Ringer stated that he asked Nurse Smith to cross out number 8, complete including head and brain, because he wanted to make sure that the nurse understood the consent that he had specifically requested from the Siegels.  Trial transcript, p. 206-207.

{¶39} Dr. Ringer did not specifically recall stating to Nurse Smith, "I do not want a complete head and brain.  That is not why she died," but he did recall that his concerns were limited to the cause of Jessica's death which was a sudden event that appeared to happen in the ICU.  Trial transcript, p. 207.  Dr. Ringer testified that he was concerned with cardiac causes, pulmonary causes, and the potential for malignant hyperthermia.  *Id.*

Dr. Ringer stated that he was concerned that some other acute event had occurred, not related to the 9- or 10-day old injury to Jessica's brain. *Id.* Dr. Ringer also testified that he most likely told Nurse Smith that the family consented to an autopsy, not that they had requested an autopsy. Trial transcript, p. 208. Dr. Ringer stated that he was the one who asked Daniel Siegel for consent to the autopsy because Dr. Ringer wanted an autopsy performed. *Id.*

{¶40} Dr. Ringer testified that he wrote an order that stated his specific requests for the autopsy. Trial transcript, p. 210; Plaintiffs' Ex. 19. Dr. Ringer testified that although his order does not contain the words "limited autopsy," his order limited the autopsy to those specific conditions: Autopsy with muscle biopsy – PE (pulmonary embolism) v. malignant hyperthermia. Trial transcript, p. 211. According to Dr. Ringer, the limitation that he had Nurse Smith make on the pathology department's form is consistent with his order and the consents that he had requested of the Siegels. Trial transcript, pp. 211-212. Dr. Ringer testified that he told the Siegels what he wanted done and what he requested consents to do before Daniel Siegel signed the form. Trial transcript, p. 212. Dr. Ringer stated that he did not specifically tell the Siegels that he was not going to autopsy the brain or head, but he discussed his reasons for the autopsy and obtained the Siegels' consent for those specific concerns before the form was completed. *Id.* According to Dr. Ringer, there was no alteration in consent; there was no alteration in the way the nurse filled it out; she filled it out erroneously initially and she corrected it. Trial transcript, p. 213.

{¶41} Dr. Ringer stated that the morning after Jessica's death, Dr. Beckman called him to confirm the order for the autopsy. Trial transcript, p. 214. Dr. Ringer testified that he discussed his order with Dr. Beckman, and that both he and Dr. Beckman agreed that because there were multiple imaging studies of the brain, they knew exactly what the pathology was in the brain, and that there was no need to autopsy the brain. *Id.* Dr. Ringer noted that Jessica had an airway procedure on the day of her death, not a neurological procedure. Trial transcript, p. 215.

{¶42} Dr. Ringer testified that he tried to contact the Siegels a couple of times to discuss Jessica's care. Trial transcript, p. 216. The medical records reflect that Dr. Ringer sent the Siegels a letter, dated August 31, 2006, where Dr. Ringer expressed

his condolences about Jessica and offered the Siegels an opportunity to answer their questions and concerns about Jessica's death.  Defendant's Exhibit B, p. 028.  Dr. Ringer later sent a second letter, dated January 25, 2007, with the same offer to the Siegels to make an appointment with his office to address any questions they had.  Defendant's Exhibit B, p. 029.

{¶43} On January 17, 2008, more than one year after Jessica's death, Daniel Siegel and his sister-in-law, Mary Gulleman, met with Dr. Ringer and asked him questions.  Trial transcript, p. 279.  According to Dr. Ringer, he did not recall whether they discussed malignant hyperthermia, but he assumes that he did.  Trial transcript, p. 216.  Dr. Ringer remembered that Daniel Siegel asked why Jessica's eyes were taken.  Trial transcript, p. 217.  Dr. Ringer testified that Daniel and his sister-in law did not ask him about the autopsy.  *Id.*  Dr. Ringer's recollection was that they were asking him about Jessica's eyes, and he was expecting them to be asking about her care.  *Id.*  Dr. Ringer was unaware of the eye issue at the time.  *Id.*

{¶44} Dr. Ringer testified that he does not know why Jessica died, but he has a strong suspicion that it was a result of advanced pneumonia, which was apparent from the autopsy.  *Id.*  Dr. Ringer testified that a full autopsy was not necessary because of the scans of Jessica's head that she had undergone before her death.  Trial transcript, pp. 217-218.  Dr. Ringer had read the scans and agreed with the radiologists' interpretations at the time of Jessica's care.  Trial transcript, p. 218.  According to Dr. Ringer, the scans were stable since the scan that showed the dramatic neurological impairment.  *Id.*  Dr. Ringer stated that until 2006, he had ordered very few autopsies, and described ordering them as rare.  *Id.*

{¶45} Two versions of Jessica's death certificate are contained in the medical records.  Plaintiffs' Exhibits 8A and 8B.  Dr. Ringer testified that his handwriting appears on Plaintiffs' Exhibit 8B, and that he filled this out before the autopsy was conducted.  Trial transcript, p. 220.  On question 30, where it states: "Enter the diseases, injuries, or complications that caused the death," Dr. Ringer wrote: "Acute hemodynamic collapse (following) tracheotomy 3 hours, hemorrhagic stroke 8 days, brain arteriovenous malformation 9 days."  Plaintiffs' Exhibit 8B.  On question 33d, where it says, "Describe How Injury Occurred," he wrote: "Medical treatment of AVM."  *Id.*  On question 32, he

marked the manner of death as "natural." *Id.* On question 28d, where it states, "Was Case Referred to Coroner?" no box is checked. *Id.* On question 28a, where it states, "Certifier (Check Only One)" where the choices are "Certifying Physician" or "Coroner," Dr. Ringer checked the box as "Certifying Physician" and signed his name, followed by M.D., on question 28e, where it states, "Signature and Title of Certifier." *Id.* The certificate of death, which is registered and preserved in Vital Statistics, Cincinnati Board of Health, is the same as the handwritten version, however, no information appears in questions 33a-f, including "Medical treatment of AVM." Plaintiffs' Exhibit 8A. Dr. Ringer did not know why questions 33a-f were blank on the official death certificate. Trial transcript, p. 223. Dr. Ringer testified that the date of injury was recorded as August 23, 2006, because for nine days after the brain injury, Jessica survived, but an acute injury occurred on August 23, the date of her death. Trial transcript, p. 221. Dr. Ringer explained that he typically did not fill out the part on the form about whether the case was referred to the coroner, and he also did not typically fill out the top part of the form, which is typed in both versions. Trial transcript, pp. 222, 224.

{¶46} Dr. Ringer admitted that, as he testified in his March 2023 deposition, over the years, the medical community has become a little less aggressive about treating high grade AVMs. Trial transcript, p. 225. Dr. Ringer testified that potential litigation about Jessica's death did not cross his mind in the moment. Trial transcript, p. 226. Dr. Ringer explained that his focus is first to manage the situation, then help to inform and provide comfort for the family, allowing them time or space as needed, and then to make sure that appropriate arrangements are made for the deceased. Trial transcript, p. 227. According to Dr. Ringer, when something goes poorly, the medical team's focus is to find out why it happened and what can be done in the future to prevent it from happening again. *Id.*

{¶47} On direct examination, Dr. Ringer testified that he is licensed in the state of Ohio and spends more than 50 percent of his time in the active clinical practice of medicine. Trial transcript, p. 233. In 2006, Dr. Ringer performed neurosurgical procedures 3 or 4 times per week. Trial transcript, p. 234. Dr. Ringer explained that he performed the August 2006 procedure on Jessica himself, with a fellow who would scrub in and observe. Trial transcript, p. 236-237. Dr. Ringer stated that in 2006, Dr. Levine

was a chief resident in his seventh year of residency, and that at Good Samaritan, chief residents would act as independent neurosurgeons, but consult with the attending physicians. Trial transcript, p. 238-240. According to Dr. Ringer, Dr. Levine's role was to evaluate the patients, provide care, and Dr. Ringer would co-sign Dr. Levine's notes. Trial transcript, p. 240.

{¶48} According to Dr. Ringer, he advised the Siegels after the August 14, 2006 procedure that something had happened. *Id.* Trial transcript, p. 241. Dr. Ringer testified that there was nothing he was trying to hide from the Siegels about Jessica's condition. Trial transcript, p. 244*.* Dr. Ringer described the radiological films that were taken during Jessica's hospitalization. Defendant's Exhibit M9. Dr. Ringer explained that there were ten CT scans of her head that were taken from August 14-23, 2006. Trial transcript, p. 246; Defendant's Exhibit M9; Defendant's Exhibit A, pages 82-84, 87-89, 92-93, 95-96, 98-99, 104-105, 108-109. When asked what the reports showed, Dr. Ringer stated:

> Our initial CT scan was performed almost immediately after her procedure. And it showed a small hemorrhage kind of where I expected to see one, based on the events of the procedure. The subsequent CT scan done just hours later showed that it had significantly enlarged. And each CT scan after that reports no change in the hematoma.
>
> Trial transcript, p. 247.

{¶49} On the day of Jessica's death, she had undergone a tracheostomy: a breathing tube was placed below the vocal cords directly into the windpipe. Trial transcript, p. 248. Dr. Ringer explained that the medical team anticipated that Jessica would need a tracheostomy for long-term support during her recovery. *Id.* Dr. Ringer testified that in the progress notes shortly before Jessica's death, Dr. Levine had written: "Patient febrile to 108 degrees. Concern for malignant hyperthermia." Defendant's Exhibit A, p. 71. Dr. Ringer explained that:

> Malignant hyperthermia is a rare condition that can occur in response to anesthesia agents that causes the patient to develop a very unusual constellation of metabolic conditions, including a very high fever. And then the unusual part really is an acidosis of both respiratory and metabolic components. . . . So the body controls its pH largely through two

mechanisms. One is called the metabolic mechanism that's mostly done by the kidneys and can be measured by the bicarbonate levels in the blood stream, and the other is by the respiratory system which is done by retaining or blowing off carbon dioxide. Typically if there's a disorder that causes one of them to go wrong, the other compensates to partially correct the acid base balance for the pH. Malignant hyperthermia is a very rare condition in which both systems drive toward acidosis and there's no compensation. . . . Both levels of acid are elevated which means the pH is lowered.

Trial transcript, p. 249.

{¶50} Dr. Ringer stated that Jessica's levels of acid, which would appear on a reading of arterial blood gases, pointed to the diagnosis of malignant hyperthermia. *Id.*, p. 249-250. Dr. Ringer testified that Dr. Levine's death note states the following: "Appropriate parties including family and coroner notified." Defendant's Exhibit A, p. 71. Dr. Ringer testified that he did not tell Dr. Levine to write a note saying that the coroner had been notified knowing that it was not true. *Id.*, p. 251-252. Dr. Ringer also noted that the discharge summary was dictated and signed by Dr. Levine, and that it states: "The appropriate parties including the patient's family and the coroner were notified. The coroner declined an autopsy; however, at the physician's request and the patient's family's approval an autopsy will be obtained." Defendant's Exhibit A, p. 168. Dr. Ringer testified that he did not instruct Dr. Levine to falsely indicate that the coroner was notified and declined an autopsy. *Id.*, p. 253-254. Dr. Ringer testified that he was present around the ICU when the call to the coroner was being made. *Id.*, p. 254. Dr. Ringer denied that he told Dr. Levine what to write in his discharge summary. *Id.*, p. 254-255.

{¶51} According to Dr. Ringer, after he learned that the coroner had declined the case, he still wanted an autopsy because he was concerned about the cause of Jessica's death. *Id.*, p. 255. Dr. Ringer explained that he asked the Siegels if an autopsy could be conducted because:

Well, after I learned that the coroner had declined the case, I was concerned about the cause of her death. I felt that something unexpected had occurred, something unexpected and sudden. And I thought it would be helpful to understand what that could be. The range of possibilities ranged

from a sudden cardiac event, which I thought was unlikely, to a sudden pulmonary event like a pulmonary embolus which was more likely or then because of the findings in the blood gases malignant hyperthermia. In particular, the last one is important because it if – if it were present, it could have implications for the rest of the family.

*Id.*

{¶52} According to Dr. Ringer, a diagnosis of malignant hyperthermia could have implications for Jessica's family because it was genetic. *Id.*, p. 259. Dr. Ringer denied that he tried to have the coroner's office decline an autopsy so that a hospital-based autopsy would be done instead. *Id.*, p. 256. According to Dr. Ringer, his expectation was that the coroner would accept the case. *Id.* Dr. Ringer added that autopsies are very infrequent, and that it was unusual for him to order one. *Id.* Dr. Ringer testified that if he were trying to hide something, he would not have ordered an autopsy; he would have let that go undone. *Id.*

{¶53} Dr. Ringer testified that he explained to Daniel Siegel why he wanted an autopsy, and that he seemed to understand, but of course was very distraught. *Id.*, p. 256-257. Dr. Ringer denied that Daniel Siegel stated that he wanted a "complete autopsy done, especially including the brain." *Id.*, p. 257. Dr. Ringer recalled that Daniel Siegel said very little during the conversation because he was distraught. *Id.* According to Dr. Ringer, if Daniel Siegel had said explicitly that he wanted a "complete autopsy," Dr. Ringer would have complied with his request. *Id.* After the conversation with Daniel Siegel, Dr. Ringer wrote an order for an autopsy, which included his primary differential diagnoses of malignant hyperthermia and pulmonary embolism. *Id.*, p. 258. A separate test of the muscle that was biopsied was sent to a lab to test for the enzyme present that would indicate malignant hyperthermia. *Id.*, p. 259. The test for the gene that is commonly transmitted and can cause families to be at risk for malignant hyperthermia came back inconclusive. *Id.*, p. 259-260.

{¶54} Dr. Ringer denied changing the autopsy authorization to attempt to hide anything about Jessica's care or the cause of her death. *Id.*, p. 261. According to Dr. Ringer, he had no immediate indication that he would be sued for Jessica's death. *Id.* Dr. Ringer denied that he had any ill will or bad intent to disrupt any plans that the Siegels

may have had for discovering what happened to Jessica. *Id.*, p. 261-262. Dr. Ringer stated that on the contrary, he asked Jessica's parents on more than one occasion to come see him to discuss Jessica's care as stated in his letters, dated August 31, 2006, and again on January 25, 2007. *Id.*, p. 262-264; Defendant's Exhibit B, pp. 28, 29. Dr. Ringer explained that if an unexpected event happens and there has not been adequate time to discuss it, it is his practice to send a letter. *Id.*, p. 263. Dr. Ringer denied sending the letters to the Siegels to pretend that he cared for the family when he really did not. *Id.*, p. 264. Dr. Ringer explained that his goal was to make sure that the family had some opportunity to ask questions. *Id.*

{¶55} When asked about the meeting he eventually had with Daniel Siegel and his sister-in-law, Dr. Ringer explained that he typically does not take any documents with him to a meeting like that; that Daniel Siegel asked him a lot of questions about Jessica's eyes; and that he was taken aback by those questions because he had no information about Jessica's eyes being harvested. *Id.*, p. 264. Dr. Ringer did not recall Daniel Siegel asking about why the brain was not autopsied. *Id.*, p. 265.

{¶56} In Dr. Ringer's opinion, he met the standard of care in his medical treatment of Jessica. *Id.*, p. 266. Dr. Ringer explained that at the time, he did his best to estimate the risk of the AVM to Jessica over her lifetime versus the risk of treatment and felt that the cumulative risk over her lifetime exceeded the risk of treatment. *Id.*, p. 267. Dr. Ringer added that this type of treatment was frequently undertaken in 2006 and still is today. *Id.* Dr. Ringer stated that there was no reason for him to hide anything or mislead the Siegels about Jessica's care at the time. *Id.* On re-cross examination, Dr. Ringer admitted that he could have ordered a complete autopsy which would have included the head and brain. *Id.*, p. 277.

**Daniel Siegel**

{¶57} Daniel Siegel testified that he was in the room with his family and his wife after Jessica had died. Trial transcript, p. 82. Nurse Smith told Daniel that Dr. Ringer would like to speak with him. *Id.* Daniel left that room and went to another room across from the nurses' station near the ICU. *Id.*, p. 82-83. Daniel testified:

Dr. Ringer asked me if I – if I ever considered – considered an autopsy? And I said yes. And he said okay. And he – he explained it to me and that. And I said to him I – I specifically expressed that I wanted a – a full autopsy done. And he agreed.

Q.      Why did you want a full autopsy done?

A.      I wanted to know what – what happened to her. I mean, you know, she went – she went downstairs that morning to have a tracheotomy done . . . and, you know, seven hours later, she's dead.

*Id.*, p. 83.

Daniel further testified:

Well, after – after Dr. Ringer and I talked about the autopsy, said yes, and Nurse Smith was standing there with the form. And we made it very clear that it was going to be a full autopsy. She checked the box. . . . And doctor – she checked the box where it says complete, including head and brain. And then Dr. Ringer said, "well, Dan, just go ahead and sign it and Nurse Smith will fill out the remaining amount."

*Id.*, p. 85.

**{¶58}** Daniel signed the form. *Id.*, Plaintiffs' Exhibit 6. Daniel testified that it was his understanding that he would get a complete autopsy, based upon the language of the authorization for autopsy and Nurse Smith's checking the box on the form for a complete autopsy. Trial transcript, p. 85-86. Daniel testified that Dr. Ringer was present when Daniel signed the form. *Id.*, p. 86. Daniel testified that "the scratch out of number eight and the muscle biopsy for malignant hyperthermia" was not on the form when he signed it. *Id.*, p. 86-87. Daniel testified that neither Dr. Ringer nor anyone else at Good Samaritan Hospital ever informed him that Jessica's brain and head would be excluded from examination during the autopsy. *Id.*, p. 87.

**{¶59}** The Siegels received Jessica's autopsy report in late December 2006. Trial transcript, p. 96. Daniel testified that he was confused about the autopsy report and did not know what "no head" meant. *Id.*, p. 97; Plaintiffs' Exhibit 7. Daniel testified that he probably scanned over things in the autopsy report in December 2006 but did not understand much of the medical terms. Trial transcript., p. 98. Daniel testified that both

he and Fran were confused about the autopsy report. *Id.*, p. 99. After discussing his confusion with his brother, Herb, he was referred to an attorney in Columbus named Paul Scott. *Id.*, p. 99-101. According to Daniel, Mr. Scott called him and talked to him extensively about what had gone on. *Id.*, p. 101. Daniel testified:

> And I was explaining to [Scott] that, you know, they had – they had taken her eyes without our permission. And just things that I didn't understand. And I asked him if he would, you know, would – would take a look and see if he could see anything, because I – you know, that's what I – so he asked me to – he asked me to send him all the medical records.
>
> Q.    And was that the first time you got the 509 pages or so of the record?
>
> A.    I – I called down – actually, my wife called down to Good Samaritan Hospital and requested all the medical records. And I went down and he – there was a certain amount of time I had to wait. I had to go down and get them and they charged me I think it was like $200 or something like that to – for the medical records, yes.
>
> Q.    Okay. And when you got those medical records of about 500 pages, did you and your wife read through all the medical records?
>
> A.    No.
>
> Q.    Okay. What did you do with them?
>
> A.    We sent them up to – we sent them up to Mr. Scott.

*Id.*, p. 101-102.

{¶60} After Attorney Scott had a physician review the records, Attorney Scott sent Daniel a letter stating that he was not going to take the case. *Id.*, p. 103. According to Daniel, Attorney Scott did not take the case because a complete autopsy was not done. *Id.* Daniel testified that Attorney Scott recommended Attorney Joe Shea for a second opinion. *Id.*, p. 105. Although Daniel never spoke to Attorney Shea, Attorney Shea sent him a letter stating that he was declining the case. *Id.*

{¶61} After Attorney Shea declined the case, Daniel was referred to his current attorney, John Metz. *Id.*, p. 106. Attorney Metz filed a lawsuit on the Siegels' behalf against LifeCenter Organ Donor Network, et al., in the Hamilton County Court of Common

Pleas on March 20, 2008. *See Siegel, et al. v. LifeCenter Organ Donor Network, et al.*, No. A0802827 (Hamilton C.P. Mar. 20, 2008). Depositions of Nurse Smith and Dr. Beckman were taken in that litigation on December 17, 2008, and January 19, 2009, respectively.[2] Trial transcript, p. 107.

{¶62} Daniel testified that the first time that he learned that Dr. Ringer had changed the autopsy consent form was the date of Smith's deposition. *Id.*, p. 108. According to Daniel, Attorney Metz filed a lawsuit against Dr. Ringer 30 days later in the common pleas court. *Id.* Plaintiffs sued Dr. Ringer in the common pleas court on January 15, 2009. *See Siegel, et al. v. Andrew Joel Ringer, MD, et al.*, No. A0900450 (Hamilton C.P. Jan. 15, 2009). Plaintiffs filed their claim in the Court of Claims on December 16, 2009. Complaint.

{¶63} Daniel testified that he attempted to meet with Dr. Ringer after he was provided with Jessica's autopsy and medical records. According to Daniel, he called Dr. Ringer's office in September 2007, and made an appointment in October 2007. Trial transcript, p. 109. However, when Daniel and Fran went there, Dr. Ringer was not there. *Id.* When another appointment in October 2007 was scheduled, Dr. Ringer had an emergency and was not able to make it. *Id.* So, another appointment was set for January 17, 2008, and Daniel and his sister-in-law, Mary Gulleman, met with Dr. Ringer. *Id.*, p. 109-110. Daniel testified:

> A.    I had a – I had a number of questions I asked him. But the two main questions that I wanted to know about because I was very confused about it, I asked him if he knew about them taking Jessica's eyes for transplantation, and he said he didn't know that. And then I asked him do you know why they didn't do a complete autopsy on Jessica? And he said he didn't know.

> Q.    You asked him that question directly; is that correct?

> A.    Yes. And then towards the end I asked him the same question.

---

[2] Although Attorney Metz repeatedly referred at trial to the date of these depositions as having occurred in 2007, the deposition transcripts show that Nurse Amie Smith's deposition was taken on December 17, 2008, and Dr. Daniel Beckman's deposition was taken on January 19, 2009. *See*, Defendant's Exhibit M-11 and Plaintiffs' Exhibit 54, respectively.

Q.    And what was his response then?

A.    He said he didn't know why.  And he told me – he says but I'll find out, Dan, and I'll get back to you.

Q.    And did he ever get back to you?

A.    No, he didn't.

*Id.*, p. 110.

**{¶64}** On cross-examination, Daniel admitted that Dr. Ringer told him that during the August 14, 2006 procedure, he had punctured an artery, and thus, Daniel knew that Dr. Ringer had made a mistake.  Trial transcript, p. 119.  Daniel also testified that Dr. Levine kept him informed about Jessica's condition throughout her August 2006 hospitalization, including that Jessica had a brain bleed, a seizure, and a hematoma.  *Id.*, p. 121.

**{¶65}** After Jessica's death, Drs. Levine and Ringer talked to Daniel and explained what had happened.  *Id.*  According to Daniel, Dr. Ringer stated that they tried to resuscitate Jessica but were unsuccessful.  *Id.*, p. 122.  Daniel testified that Dr. Ringer requested his consent for an autopsy.  *Id.*  Daniel agreed that Dr. Ringer told him that he had a concern that Jessica's cause of death was malignant hyperthermia because she had had a high fever before she died.  *Id.*, p. 123.  Daniel agreed that one of the reasons for the autopsy was to take a muscle biopsy to test for malignant hyperthermia, because it might be hereditary.  *Id.*  Although Daniel testified that he told Dr. Ringer that he wanted a full autopsy and that Dr. Ringer approved of that, Daniel stated that Dr. Ringer never said the words "complete autopsy" to him.  *Id.*, p. 123-124.  Daniel testified that Nurse Smith did not discuss the autopsy with him but that she had him sign the paperwork for it.  *Id.*, p. 124.  According to Daniel, the only writing on the form when he signed it was the check mark for a complete autopsy.  *Id.*  Daniel testified that when he signed the form, the box was checked, both Dr. Ringer and Nurse Smith were present, and Dr. Ringer said, "Well, just go ahead and sign the form and Nurse Smith will take care of the rest of it."  *Id.*, p. 124-125.

**{¶66}** Daniel testified that he received a letter from Dr. Ringer dated August 31, 2006, where Dr. Ringer offered to discuss Jessica's case and answer any questions.  *Id.*, p. 127-129; Defendant's Ex. B p. 28.  Daniel testified:

Q.    Would you think that as you're now saying Dr. Ringer had a –
or as your attorney is saying had a scheme to hide the cause of Jessica's
death, do you think this would be a logical thing for him to do, to write you
a letter saying come in and talk to me?

A.    No.

Q.    Okay.  That doesn't make any sense, does it?

A.    But I don't know what his – I can't talk for Dr. Ringer.

Trial transcript, p. 129.

{¶67} Daniel testified that he had to go to the hospital to pick up a copy of the autopsy report in December 2006.  *Id.*, p. 130.  Contrary to his testimony at the evidentiary hearing eleven years ago, where Daniel testified that he did not read the autopsy report for approximately one year after Jessica's death (May 15, 2013 immunity hearing transcript, p. 132-133; *See also*, *Siegel v. State*, 2020-Ohio-4708, ¶ 17 (10th Dist.), Daniel testified:

Q.    Okay.  And you picked that up and brought it home.  But you
didn't read it right away, true?

A.    Not right away.

Q.    It was a good while, like maybe a year or more?

A.    No.

Q.    No, it wasn't?

A.    No.

Q.    Okay.  And had you read it, the first page of it, right here where
it says Reason for autopsy:  Requested by physician, autopsy restrictions.
It says "none" and then under in caps it says "NO HEAD."  And had you
read it when you got it in December, you would have known that they didn't
do an autopsy of Jessica's head or brain?

A.    I don't – I don't think I would have came to that conclusion
from that.  I didn't – that was – that's confusing.  I don't know what that
means.

Q.      Okay.  And had you looked through any of the rest of the report – and I think it's like six or seven pages – you would have seen there was no examination of the head, true?

A.      I don't recall that.

Q.      You don't recall that?

A.      I don't recall that – what I recall more than anything was the fact that the pathologist said that they removed her eyes for transplantation, but whatever the – whatever the wording is.

Q.      Okay.  And did you remember reading the part here where it talks about the malignant hyperthermia that Dr. Ringer mentioned as one of the potential causes of death?  Did you ever read that?

A.      I can't recall what I read on that autopsy.  That's been – it's such a long time ago.  I can't remember that.

Q.      Sure.  But it's an important issue in this case, isn't it?

A.      Well, it is now.

Q.      Yeah.  And it was back in 2013 when we took your testimony at the immunity hearing, true?

A.      Uh-huh.

Q.      And it was an important issue back when your deposition was taken in 2008, too, true also?

A.      It was an important issue because of what I stated, yes.

Q.      Now, had you looked through the autopsy report at all – and I'm just going through it real quickly – that's where you learned that the eyes had been taken unfortunately?

A.      Yes.

Q.      And did you – did you learn anything – if you had looked, did you see anything here about the head or brain not being examined?

A.      No, I didn't.

Trial transcript, p. 130-132.

{¶68} Daniel testified that he did not read the autopsy report when he received it, even though at the same time he was very concerned that something in Jessica's brain had caused her death. *Id.*, p. 134.

{¶69} Daniel did not dispute that Dr. Ringer sent a second letter, dated January 25, 2007, which again invited the Siegels to contact him to discuss Jessica's care. Defendant's Exhibit B., p. 29. By that time, Daniel had contacted Attorney Scott. *Id.*, p. 135. In a letter dated January 8, 2007, Scott asked Daniel to send him Jessica's medical records, and explicitly stated that there were time limits to filing a lawsuit, including a one-year statute of limitations for filing a medical malpractice claim, and a two-year statute of limitations for filing a wrongful death claim. *Id.*, Plaintiffs' Exhibit 13B.

{¶70} Although Daniel could not recall when he received Jessica's death certificate, he did receive it at some point, because Attorney Scott asked Daniel to provide him with it. Trial transcript, p. 136; Plaintiffs' Exhibit 13B. Daniel admitted that the death certificate that contains Dr. Ringer's handwriting states, "Medical treatment of AVM" in the part that asks "Describe How Injury Occurred." Defendant's Exhibit B, p. 024. When asked whether Dr. Ringer would have written that if he were trying to hide the cause of Jessica's death, Daniel did not directly answer, but agreed that he thought that Jessica had died as a result of medical treatment of the AVM. Trial transcript, p. 137-138.

{¶71} Daniel testified that when he finally met with Dr. Ringer, he asked him about why Jessica's eyes had been taken, and Dr. Ringer stated that he did not know. *Id.*, p. 138-139. With regard to the limitation on the autopsy, Daniel testified:

> Q.     And with reference to the autopsy authorization and it being limited to everything but the brain, did Dr. Ringer tell you that he didn't recall why it was that way?
>
> A.     That the autopsy request form wasn't that way?
>
> Q.     Yeah. That he didn't recall that?
>
> A.     Did he tell me that?
>
> Q.     Yes, sir.
>
> A.     No.
>
> Q.     He didn't say that?
>
> A.     Not to me.

> Q.      If he'll testify to that, do you not believe that to be true?
>
> A.      I – you know, that's – that's up to Dr. Ringer.

*Id.*, p. 139.

{¶72} Daniel testified that he had sent medical records to Attorney Scott and then Attorney Shea in the timeframe of January to April 2007, with the intent to see if they could file a lawsuit about Jessica's care and her death. *Id.*, p. 140. The letter from Attorney Scott declining the case is dated April 1, 2007. Plaintiffs' Exhibit 13F. The letter from Attorney Shea declining the case is dated June 15, 2007. Plaintiffs' Exhibit 14. Daniel admitted that by the time he met with Dr. Ringer, he had corresponded with two attorneys and had sent them Jessica's medical records because his intent was to see if they could file a lawsuit about Jessica's care and her death. Trial transcript, p. 140. Daniel admitted that the attorneys investigated potential medical malpractice and wrongful death lawsuits. *Id.* However, Daniel denied thinking at the time that Dr. Ringer had done something wrong and had caused Jessica's death. *Id.*, p. 140-141. Daniel testified that he did not have any reason not to trust Dr. Ringer when he met with him. *Id.*, p. 141. Daniel testified that although he had the medical records with the operative report that showed that Dr. Ringer performed the embolization surgery, he had an assistant, Dr. Khan, so he does not know to this day exactly who performed the procedure. *Id.* Daniel admitted that he would assume that either Dr. Ringer or Dr. Khan performed the procedure. *Id.*

{¶73} Daniel testified that when he received the medical records to send to Attorney Scott, he scanned through them and saw a lot of things he did not understand because he does not have the background for it. *Id.*, p. 142. However, Daniel testified in his April 28, 2023 deposition that when he received Jessica's medical records to send to Attorney Scott, which would have been between January and April 2007, he went through them and noticed on the autopsy authorization that part of the form was "scratched out," and that was the first time that he knew that the autopsy authorization had been changed. *Id.*, p. 144-145. At trial, Daniel testified:

> Q.     . . . So what you said then is before April of '07 was the first
> time you noticed that the autopsy authorization had been changed, right?
>
> A.      Okay.

Q.      And that's what you said back then?

A.      Okay.

Q.      Today you're saying something different, right?

A.      Well, the fact that I saw it was scratched out, that – that doesn't mean I reacted to that – on it like that.  I don't – I just noticed it was scratched out.  Why, I didn't know.

*Id.*, p. 145-146.

**{¶74}** Daniel testified that although he agreed in his April 2023 deposition that the only other signatures on the authorization for autopsy were those of Nurse Smith and Dr. Ringer, and that one of those two people had to have scratched out the words "complete autopsy," Daniel could not say for sure if that was true.  *Id.*, p. 146.  At trial, Daniel also stated that he did not know whether Nurse Smith scratched out the words "complete, including head and brain," wrote "error, AS" and then wrote the date and time on the autopsy authorization, because he was not there to witness it.  *Id.*, p. 147.

**{¶75}** Daniel testified that the letter from Attorney Scott, dated April 1, 2007, explained the one-year statute of limitations for a medical malpractice claim and the two-year statute of limitations for a wrongful death claim.  *Id.*, p. 148; Defendant's Exhibit M-5.  However, Daniel denied thinking anything about that at the time.  Trial transcript, p. 148.  According to Daniel, he asked Attorney Scott to look at Jessica's medical records to see if there was anything that went wrong.  *Id.*, p. 149.  Daniel knew that Jessica's eyes had been taken.  *Id.*  Daniel admitted that he was concerned about Jessica's care at Good Samaritan Hospital in general, not necessarily only by Dr. Ringer.  *Id.*, p. 152.  Daniel did not know whether any of his claims for medical negligence had been timely filed.  *Id.*, p. 154.

**{¶76}** On redirect, Daniel reiterated that the first time he found out that Dr. Ringer had limited the autopsy to exclude the brain was during Nurse Smith's deposition, which was taken on December 17, 2008.[3]

---

[3] Again, Nurse Smith's deposition was taken on December 17, 2008, not 2007, as stated repeatedly in the trial transcript by Attorney Metz.

{¶77} On May 15, 2013, during the evidentiary hearing on the issue of Dr. Ringer's immunity, Daniel testified that when he finally received the autopsy, it took him quite a while to even open it up to read it. Plaintiffs' Exhibit 26, p. 116. When he eventually met with Dr. Ringer, Daniel asked him why no autopsy of the brain was done, and why Jessica's eyes were taken for transplantation. *Id.*, p. 118. According to Daniel, Dr. Ringer said he did not know why the brain was not examined and did not know that her eyes had been taken. *Id.*

**Frances Siegel**

{¶78} Frances testified that approximately two months after Jessica's death, the Siegels had not received an autopsy report, so she called Good Samaritan Hospital about it. Trial transcript, p. 563-564. Frances testified that she and Daniel received a copy of the autopsy report in December 2006. *Id.*, p. 564. Frances testified that she and Daniel do not have any medical or pathological training, but Frances noticed the following irregularities in the autopsy report: Jessica's height was 5 feet, 3 inches, but the autopsy report stated she was 5 feet, 10 inches tall. *Id.*, p. 564. The autopsy report stated that her eyes had been enucleated. *Id.*, p. 565. The autopsy report stated, "no head." *Id.* Frances thought, "is this the right autopsy report? I thought, did they make a mistake? Did they send us somebody else's autopsy report? I didn't know what to think. And Dan and I looked it over and we said somebody's got to look at this. This doesn't make sense." *Id.*, p. 565.

{¶79} Because the Siegels had questions about the autopsy report, they asked for a copy of the medical records. *Id.*, p. 566. Once they obtained the medical records, they started reviewing the records, which totaled 509 pages. *Id.* The Siegels did not understand the medical terminology, so they asked Daniel's brother, Herb Siegel, to refer them to an attorney, and he referred them to Attorney Paul Scott. *Id.*, p. 567. Frances testified: "And the reason we went to him [Attorney Scott] not – I mean, we weren't looking to sue anybody. We were looking for somebody to look over the medical records and the autopsy report to see if somebody sent us something wrong and actually to explain to us about these medical records." *Id.*, p. 567.

{¶80} Frances testified that she was not present when Attorney Scott discussed Jessica's case with Daniel. *Id.*, p. 567-568. According to Frances, after Attorney Scott requested the medical records, he rejected the case because he did not have enough information. *Id.*, p. 568. Frances did not have any direct contact with Attorney Shea but understood that he declined to take the case as well. *Id.* p. 568-569. After being rejected by two law firms, Frances did not know what to do. *Id.*, p. 569. But she and Daniel were both concerned because Jessica's eyes had been taken. *Id.* Herb Siegel asked his boss at the time, Joe Deters, for a referral and the Siegels were referred to their current counsel, John Metz, who filed a case against the eye bank. *Id.*

{¶81} Frances testified that the first time she learned that Dr. Ringer was the one that decided to limit the autopsy and exclude the brain was after Amie Smith's deposition was taken, and Attorney Metz showed the Siegels the consent form. *Id.*, p. 571. Frances testified that she never saw the form in the 509 pages of the medical records. *Id.* Frances testified that when she learned that Dr. Ringer had limited the autopsy, she was shocked because she thought that Dr. Ringer was going to order a complete autopsy because Jessica had suffered a brain bleed. *Id.* Although Frances testified that she knew that Daniel had met with Dr. Ringer several months earlier and that he had asked Dr. Ringer about why a full autopsy was not conducted, Frances did not attend the meeting with Dr. Ringer herself. *Id.*, p. 571-572. Frances testified that the first time that she learned that Dr. Ringer had discussed a limited autopsy with Dr. Beckman was during Dr. Beckman's deposition in the eye bank case. *Id.*, p. 572. Dr. Beckman was deposed on January 19, 2009. Plaintiffs' Exhibit 54. Frances testified that in the many years of trying to learn the medical truths in this case, she believes that she and Daniel are "indebted" to Attorney Metz for close to $100,000 for hiring experts. *Id.* p. 583.

{¶82} On cross-examination, Frances testified that she did not know whether she owed Attorney Metz $100,000, and that she has not paid any of those expenses to date. *Id.*, p. 584-586. Frances did not remember signing a fee contract with Attorney Metz. *Id.*, p. 586-587.

{¶83} Frances testified after Jessica died, Frances did not know whether the coroner's office was called, and she was not present for the conversation between Daniel and Dr. Ringer. *Id.*, p. 587-588. Frances stated that after Daniel had a conversation with

Dr. Ringer, Daniel told her, "we're going to do an autopsy; is that ok with you," or something to that effect. *Id.*, p. 588.

{¶84} Frances stated that she received the autopsy report in December 2006, and that when she looked at it, she noticed that Jessica's height was wrong, and then she proceeded to look at the rest of it and noticed two other things. *Id.*, p. 589-590. First, she noticed that the autopsy report stated that Jessica's eyes had been removed for transplantation. *Id.*, p. 590-591. Frances was shocked because she thought that Daniel had told the organ donation company that the Siegels were not going to give any donation. *Id.*, p. 590-591. Second, Frances noticed that under "autopsy restrictions" it says "none, no head." *Id.* Frances testified that she received the autopsy report around the same time that she received Jessica's medical records. *Id.*, p. 591-592. Frances stated that when she looked at the autopsy report and the medical records, she decided that she wanted to find out what was meant by some of the things she did not understand, so the Siegels contacted Herb Siegel and were referred to Attorney Scott. *Id.*, p. 592. Then, Attorney Scott reviewed the records and autopsy report and Attorney Scott sent them a letter stating that he was not able to help, and informed the Siegels about the time limits on filing different lawsuits. *Id.* p. 592-593. Frances testified that despite Attorney Scott's letter, the Siegels weren't really paying any attention to the time limits for filing a medical negligence or wrongful death lawsuit because they weren't thinking about a lawsuit; they were thinking that something was wrong with the autopsy report. *Id.*, p. 593. Frances stated that after Attorney Scott's April 1, 2007 letter, the Siegels contacted Attorney Shea's office and Jessica's medical records were sent to Attorney Shea. *Id.* Attorney Shea sent them a letter dated June 15, 2007, stating that he could not help either. *Id.*

{¶85} Frances testified that the Siegels were not thinking about the statute of limitations for a medical malpractice case even though the statute of limitations would expire roughly two months after the date of Attorney Shea's letter, because they were on

> a fact-finding mission, trying to find out if somebody could read these
> medical reports and tell us what had happened. And the only way to do that
> is I think we had already went to Dr. Ringer, he didn't answer a lot of the

questions.[4]   And he – you know, so we went to an attorney thinking they could look at this autopsy report and see if – if something was wrong with it or if indeed it was the correct autopsy report.  That was my understanding.

*Id.*, p. 594.

**{¶86}** Frances testified that she first went to see Attorney Metz sometime in 2008. *Id.*, p. 594.  Frances believed that Daniel met with Dr. Ringer before she and Daniel met with Attorney Metz, but she was unsure of the dates.  *Id.*, p. 594-596.  The Siegels filed suit against the eye bank in March 2008.  *Id.*, p. 596-597.  Frances testified that at the time, she was not concerned about the wrongful death statute of limitations that Attorney Scott informed them about twice, which would expire about five months after they filed suit against the eye bank.  *Id.*, p. 597.  Frances did not know why the depositions of Amie Smith and Dr. Beckman did not occur until December 2008, even though Attorney Metz filed suit against them in March 2008.[5]   *Id.*, p. 597-598.  Frances was aware that the lawsuits against Dr. Ringer and Mayfield Clinic filed in Hamilton County in January 2009, and the claims for medical malpractice and wrongful death filed in the Court of Claims in December 2009, have been dismissed based upon the applicable statutes of limitations. *Id.*, p. 598-599.

**{¶87}** Frances attended Daniel's deposition in April 2023, where Daniel testified that he knew the autopsy authorization had been scratched out sometime before April 2007, but she did not tell Daniel that his testimony was inaccurate.  *Id.*, p. 599-600. Frances testified that she knew his testimony was incorrect at the time because there was no way he could have known that, but she did not tell him to correct his testimony.  *Id.*

**{¶88}** In the immunity hearing, Frances Siegel testified that the first time she learned of the eyes being harvested was when her husband read the autopsy report, which she estimated was in December 2007 or January 2008.  Immunity hearing transcript, p. 154-155.  Her testimony at trial shows that she and her husband read the autopsy report in December 2006.  Trial transcript, p. 564-565.

---

[4] The date of the meeting with Dr. Ringer was January 17, 2008, months *after* Attorneys Scott and Shea declined to take Jessica's case.

[5] Although Amie Smith's deposition was taken on December 17, 2008, Dr. Beckman's deposition was taken on January 19, 2009.

**Magistrate's Findings About Events That Occurred on August 23, 2006**

{¶89} Upon review of the evidence regarding the events on the day of Jessica's death, the magistrate finds that although the Hamilton County Coroner's Office does not have documentation that a call was made, a preponderance of the evidence shows that Dr. Levine telephoned the coroner's office, and that the coroner's office did not take Jessica's case. The magistrate makes this finding despite the testimony of Andrea Hatten because the magistrate is persuaded by Dr. Levine's testimony, the medical records, Nurse Smith's deposition with attached exhibits, and the written transcription of Nurse Smith's recorded telephone conversation with a representative from the organ donation company. The magistrate finds that Dr. Levine's testimony that he called the coroner was credible. The magistrate also finds credible Dr. Levine's testimony that he would not and did not falsify medical records. Furthermore, Dr. Levine's notes in the medical record reflect that the coroner was called and declined an autopsy. The magistrate further finds credible Nurse Smith's statement to the organ donation employee that a call was being made to the coroner's office while she was on the phone with the organ donation employee. In addition, Nurse Smith indicated on a form in the medical record that it was not a coroner's case. Smith Deposition, Exhibit 5, p. 56/63. Furthermore, the magistrate finds that of the five examples of deaths that were documented as reported to the Hamilton County Coroner's office on August 23-24, 2006, two of those individuals died in a hospital setting. *See* Exhibits D-1 through D-5 of Hatten's Deposition. Both the individual who died in the emergency room at Mercy Franciscan-Western Hills and the individual who died at the emergency room at Mercy Hospital Anderson were classified as non-coroner cases, and no immediate cause of death was noted in either case. *Id.* Hatten testified that her office would not perform an autopsy if a physician, not in the coroner's office, was signing the death certificate. Hatten Deposition, p. 15. Dr. Ringer signed the death certificate in this case. This evidence is persuasive to the magistrate that the coroner's office rejected Jessica's case although the coroner's office does not have a death record for Jessica Siegel. Therefore, although there is conflicting evidence on this fact, the magistrate finds that Dr. Levine contacted the Hamilton County Coroner's

office on the night that Jessica Siegel died, and that the Hamilton County Coroner's office declined Jessica's case.

{¶90} However, the magistrate further finds that if Jessica's case had been accepted by the coroner's office, a full autopsy would have been conducted. Andrea Hatten's testimony on this point is undisputed. The magistrate further finds that the testimony of Nurse Smith was more credible and accurate than the testimony of either Daniel Siegel or Dr. Ringer regarding how the authorization for autopsy form was filled out, because Nurse Smith was responsible for filling out the death packet as part of her job duties. Nurse Smith testified credibly that Daniel Siegel signed an incomplete form because the Siegels wanted to leave the hospital before Nurse Smith had completed the necessary forms. The magistrate further finds that Daniel Siegel signed an autopsy authorization that had no limitation on it before leaving the hospital, that the authorization form gave consent for a "complete autopsy" as stated on the form, and that Dr. Ringer did not limit the form until after the Siegels left the hospital. The magistrate further finds that Dr. Ringer limited the autopsy but did not explicitly inform the Siegels that he was going to limit it. Although the magistrate finds that Dr. Ringer did express the specific concerns he had about Jessica's death to Daniel Siegel when Dr. Ringer obtained consent for an autopsy, the magistrate further finds that Dr. Ringer did not explicitly tell Daniel Siegel that the autopsy he requested would exclude Jessica's brain.

{¶91} The magistrate further finds Daniel Siegel's testimony that he orally requested a "complete autopsy" was not credible. First, the form authorizes a complete autopsy, so there would be no need for Daniel Siegel to specify that. Second, Nurse Smith testified credibly that she check-marked the box, "complete, including head and brain" while she orally stated that to Dr. Ringer, after the Siegels had left the hospital. Daniel Siegel's testimony that the "complete" box was check-marked when he signed it was not credible in light of Nurse Smith's testimony. The magistrate finds that it is more likely than not that Daniel Siegel signed the authorization form and assumed that a complete autopsy would be conducted, because the form specifically states that he authorized a complete autopsy and because Dr. Ringer did not explicitly tell Daniel Siegel that he intended to exclude examination of the head and brain. Furthermore, the magistrate finds that Nurse Smith also assumed that a complete autopsy would be

conducted, because she initially checked the box for complete autopsy. The magistrate finds that after Dr. Ringer directed Nurse Smith to limit the autopsy to the thorax and abdomen and to add a muscle biopsy, Nurse Smith corrected the form and wrote her initials and the date. However, the magistrate further finds that Dr. Ringer did not contact the Siegels to explicitly inform them that the autopsy had been limited. The magistrate also finds that Dr. Beckman's testimony was credible, that he was bound by the limitation on the authorization for the autopsy, and he was not authorized to remove the brain for examination.

{¶92} To summarize, the magistrate finds that Dr. Levine contacted the Hamilton County Coroner's Office about Jessica Siegel's death, but the coroner's office did not accept Jessica's case. The magistrate further finds that after Dr. Ringer was informed that the coroner had rejected the case, Dr. Ringer discussed with the Siegels his specific concerns about Jessica's sudden death and asked Daniel Siegel for his permission to obtain an autopsy to determine whether Jessica died from a cardiac issue, a pulmonary issue, or from malignant hyperthermia. The magistrate further finds that Daniel Siegel signed an authorization form which did not contain any limitation on the autopsy, and that Dr. Ringer did not explicitly inform the Siegels that any limitation would be placed on the autopsy. The magistrate further finds that Dr. Ringer admitted that a full autopsy could have been performed if he had not placed a limitation on the autopsy. The magistrate further finds that it was Dr. Ringer's sole decision to limit the autopsy, and he exercised his professional judgment when he decided that an examination was not necessary because of the many CT scans of Jessica's brain that were already contained in the medical records. Accordingly, the magistrate finds that it was reasonable for the Siegels to expect that a complete autopsy would be performed when they left the hospital on August 23, 2006. The question becomes whether it remained reasonable for them to rely on that expectation after the autopsy report and medical records were provided to them four months later.

**Events That Occurred After Jessica's Autopsy and Medical Records Were Provided to Plaintiffs**

{¶93} **Paul O. Scott** testified that he graduated from Capital Law School in 1974 and practiced law until he closed his office in 2014.  Scott's CV is Plaintiffs' Exhibit 13H. Although he has "basically retired," Scott still maintains his Ohio law license and averages one case per year.  Scott was a partner at Clark Perdue and practiced in the field of medical malpractice for many years.

{¶94} Scott testified that he came into contact with the Siegel family in 2007.  Scott had a telephone conversation with either Mr. or Mrs. Siegel.  *Id.*, p. 298.  As a result of the conversation, Scott sent the Siegels a letter, dated January 8, 2007, asking for Jessica's medical records.  Plaintiffs' Exhibit 13B.  According to Scott, he made it clear that he would perform a preliminary screening to see whether he was willing to investigate the case at all.  Trial transcript, p. 300.  Scott cautioned the Siegels about the one-year statute of limitations for medical malpractice claims and the two-year statute of limitations for wrongful death claims in his first letter.  *Id.*  Scott stated that the statute of limitations is very complicated, and it is a difficult decision as a lawyer about how much to explain it to a potential client, but he thought it was the best practice to try to identify the statute of limitations for potential clients.  *Id.*, p. 302.

{¶95} Scott testified that on January 29, 2007, he sent Jessica's medical records, death certificate, autopsy report, and some notes that the Siegels had written, to Tom Syzek, M.D., an emergency room physician, for a preliminary screening which would determine whether Scott was willing to investigate the matter further.  Plaintiffs' Exhibit 13C; Trial transcript, p. 304-305.  Scott had used Dr. Syzek before for preliminary screenings and testified that he was impressed with Dr. Syzek's concise medical/legal analysis.  Trial transcript, p. 304*.*  Scott sent the Siegels a letter on February 7, 2007, to inform them that Jessica's records were being reviewed by a screening physician.  *Id.*, p. 305; Plaintiffs' Exhibit 13D.

{¶96} Scott testified that he recorded a telephone conversation with Dr. Syzek to discuss Jessica's medical records on March 16, 2007, a transcription of which is contained in a file memorandum.  Trial transcript, p. 305-306; Plaintiffs' Exhibit 13E.  The transcript of the telephone call goes into detail about what Dr. Syzek analyzed from Jessica's medical records.  Plaintiffs' Exhibit 13E.  Scott testified that the memorandum summarized the problems that he and Dr. Syzek saw, including whether there was a

deviation from the standard of care, the number of expert witnesses necessary for a case, the lack of an autopsy of the brain, the cause of Jessica's high fever, problems with the tracheostomy, and the concern about malignant hyperthermia.  Trial transcript, p. 306-307.  Scott testified:

> I wasn't willing to investigate it because I didn't have the mechanism of death.  Now, that is not my words, other legal words inextricably intertwined with the standard of care; they kind of go hand in hand.  You can't kind of prove the one without the other.  You've got to have this mechanism of death to go forward in this kind of case.
>
> . . .
>
> And I think a fair reading of the memorandum – even though it's not mentioned frequently, a fair reading is the investigation is inhibited or disrupted because we don't have a mechanism of death.  We don't have a clear forensic analysis of what caused Jessica's death.

*Id.*, p. 307-308.

> Scott continued:
>
> Q.      And how important was it from your legal analysis of this case to not have a complete autopsy?
>
> A.      It was very important, and I think that's echoed by Dr. Syzek.  When he uses that term that caught my attention again when I reviewed it, "missed the whole boat" because they don't have an autopsy of the brain.

*Id.*, p. 309.

{¶97} The magistrate notes that in file memorandum, which is dated March 16, 2007, Dr. Syzek states the following:

> Yes.  You are correct in that I saw no autopsy of the brain.  It is to me extraordinarily unusual – it's missing the whole boat in my viewpoint.  My immediate thought was if you are going – if this needs to be pursued, that brain should have or should be autopsied.  I guess it's probably too late, but there is also some confusion over that the father give consent or request not to have consent so I think there is an issue over the family felt that they gave consent and yet I didn't see it, but apparently there is something in

there where it is checked no autopsy on the brain.  It will be difficult to prove a case – well, it is going to be very helpful evidence had there been a brain autopsy to see how bad the extent of the damage, where the – they can anatomically see where the complications occurred and dissect down to microscopic level to see what happened during the surgery and now that opportunity is lost.

Plaintiffs' Exhibit 13E, p. 5.

{¶98} Scott testified that these kinds of cases are very expensive because of the number of expert witnesses in specialized areas of medicine that are required.  *Id.*, p. 309-310.  Scott also testified that Jessica's case was very high tech and complicated.  *Id.*, p. 314.  Scott testified that the requirement of filing an affidavit of merit from a physician in the same specialty is also difficult.  *Id.*, p. 315.

{¶99} After the telephone conversation with Dr. Syzek, Scott wrote a letter to the Siegels, dated April 1, 2007, declining Jessica's case.  *Id.*, p. 316; Plaintiffs' Exhibit 13F. The letter states, in pertinent part, as follows:

Our laws require that the patient/plaintiff clearly prove, by expert witnesses, that the defendant's care was below the prevailing standard of care that other doctors in that specialty would provide.  Secondly, and sometimes with more difficulty, we must prove that this departure from standard care is what caused, directly or indirectly, the particular injuries the patient claims are a result of treatment.  The expert testimony necessary to prove the first two issues must be provided by a medical practitioner with the same or similar background and specialty as that of the defendant.  All these medical and legal factors can only be put together after a detailed and expensive review of many medical records.

The information we have obtained on your claim has been considered against the legal requirements described above and from the standpoint of our experience in past claims.  Unfortunately, we have concluded that your claim does not meet our present criteria for recommending further action,

either by further investigation or by the filing of a formal claim. As a result, we regret we cannot undertake your representation. We cannot help.

Please remember that law, like medicine, often involves differences of opinion. Our decision does not mean that you do not have a cause of action, but only that it is our business decision not to handle the claim. We do encourage you to seek other opinions, and to do so quickly.

Your situation involves a claim for wrongful death. **There is a one-year time limitation within which your medical malpractice claim must be filed.** There is a two-year time period, from the date of death, for filing a wrongful death claim caused by medical negligence. However, any claim for pain and suffering or other losses is controlled by the one-year limit.

The one year time period begins to run either (1) when the patient discovers or, in the exercise of reasonable care and diligence should have discovered, the resulting injury, or (2) when the physician-patient relationship for the condition terminates, <u>whichever occurs later</u>. Although there is an exception, there is a general rule that an action for medical malpractice must be commenced no later than four years from the date of the occurrence, regardless of when you discover the injury or terminated your patient relationship with your health care provider. If you do not commence your claim on time, you will be forever barred from presenting a claim.

(Emphasis in original.)

{¶100} Scott testified that he was trying to be very careful with his words to the Siegels; that he tried to give them a little detail about how difficult medical malpractice cases are; and that he concluded that their case didn't meet the present criteria standards by recommending either further investigation or filing a case. Trial transcript, p. 317. Scott explained that he was not saying that the Siegels did not have a case, but, rather that his law firm was not willing to investigate the case. *Id.* Scott testified that the rest of the letter tries to explain the applicable statutes of limitations for medical malpractice and wrongful death claims. *Id.*, p. 317-318.

{¶101} Scott further testified that he wrote a letter to Attorney Joe Shea on April 1, 2007, where he forwarded Jessica's records, including insurance information, the autopsy report, the death certificate, family notes, and the medical records from Good Samaritan Hospital. Plaintiffs' Exhibit 13G. Scott testified that he wanted to act very quickly to get the Siegels an outstanding lawyer in the Cincinnati area. Trial transcript, p. 319. Scott testified that this ended his connection with the Siegel family. *Id.*, p. 320.

{¶102} Scott testified, over defendant's objection and motion to strike:

Q.    Back in 2007 had you had a complete autopsy, would that have changed your review of the case leaning more toward further investigation and possibly taking the case?

. . .

A.    It's possible, but the autopsy in theory could have helped the doctor. I don't have the mechanism of death. If the autopsy came out saying here's what – make it up. The autopsy comes out and says here's the problem, it's the tracheostomy.

Q.    Uh-huh.

A.    That could have in a sense led me in a different direction.

Q.    Right.

A.    Or the autopsy could say here's what happened, and I wouldn't see any clear deviation from the standard of care. Maybe the autopsy would pinpoint where the bleeding was, pinpoint where the hemorrhaging is, and it might have fit into a cycle. So I don't know if the autopsy would have helped or hurt. But I can say that it interrupts, you know, and it interferes with the investigation.

*Id.*, p. 322.

{¶103} On cross-examination, Scott testified that you don't necessarily need an autopsy in a wrongful death or medical malpractice case to file suit. *Id.*, p. 324; 342. Scott was investigating this case as a potential medical malpractice/wrongful death case, with the main focus on the neurosurgeon. *Id.*, p. 324-325. Scott testified that the statute of limitations is so important to a client because you lose your claim forever if the case is not timely filed, and that is why he explained the statute of limitations to the Siegels in

both letters. *Id.*, p. 327. Scott testified that an attorney could get sued for missing the statute of limitations. *Id.*, p. 323-324. Scott testified that in reviewing the medical records he saw that the autopsy authorization had some crossed-out portions. *Id.*, p. 327-328.

{¶104} With regard to Dr. Syzek, Scott testified that he sent Jessica's medical records for review on January 29, 2007. Defendant's Exhibit M3; Trial transcript, p. 329. Scott testified that Dr. Syzek was an emergency room physician who ran Midwest Medical/Legal Consultant Service in Cincinnati, Ohio. Trial transcript., p. 329. Scott testified that if he had decided to sue Dr. Ringer, he would have had to obtain an affidavit of merit from a neurosurgeon, not an emergency room physician. *Id.*, p. 330. Scott was aware of groups such as MedQuest in New York or Saponaro that provide expert medical services to review medical negligence cases for plaintiffs' attorneys, but he did not engage in their services for this case. *Id.*, p. 330-331.

{¶105} With regard to the recorded interview with Dr. Syzek, Scott testified that out of the five-page document of the transcript of the call, only ten lines discuss the fact that an autopsy of the brain was not conducted. *Id.*, p. 332-333; Defendant's Exhibit M4. Scott acknowledged that the rest of the document discusses the medical procedures and whether the medical treatment was below the standard of care or whether causation could be proved. Trial transcript, p. 333. Scott acknowledged that he stated in the recording that in his opinion, "we have major issues with standard of care, we have major issues with causation, major issues with life expectancy, and this highly unusual additional complication with the anesthesia and the tracheotomy." Defendant's Exhibit M4, p. 6; Trial transcript, p. 333. Scott admitted that those were his major issues in this case and in its investigation. Trial transcript, p. 333. Scott acknowledged that Jessica underwent a difficult surgery; that Scott was concerned about the number of experts he would have to hire to prosecute the case; that there was difficulty in proving the cause of death; and that there was difficulty proving a standard of care deviation. *Id.*, p. 333-334. Notably, Scott testified that in his April 1, 2007 letter to the Siegels, he did not specifically tell the Siegels that he could not investigate the case any further because there was not a complete autopsy. *Id.*, p. 334-335; Defendant's Exhibit M5. Scott testified that the lack of a complete autopsy was not the sole reason he declined to investigate Jessica's case any further. Trial transcript, p. 340.

{¶106} **Joseph W. Shea III** graduated from Chase law school in 1974, passed the Bar Exam in June 1974, and has practiced civil litigation, with a focus on medical/legal matters. *Id.*, p. 481. Shea is currently licensed and practices in Kentucky and Ohio and has known and respected Attorney Paul O. Scott for several years. *Id.*, p. 481-482.

{¶107} Shea explained that when plaintiffs' lawyers in complicated cases can't find a path to assist a client, they will ask for another lawyer to look at it, to get a second opinion. *Id.*, p. 484. Shea testified that he received a letter, dated April 1, 2007, from Scott asking him to review Jessica's potential case, which included an autopsy, death certificate, family notes, and medical records. Plaintiffs' Exhibit 13G; Trial transcript, p. 484-485. Shea testified that to obtain an affidavit of merit, you must show a breach of a standard of care and that harm arose from the breach of the standard of care: a two-step process. *Id.*, p. 486. Shea testified that for wrongful death cases, you begin with the death certificate to find out not only the immediate cause of death, but also the mechanism of death. *Id.*, p. 487. Shea described the mechanism of death as the process of what caused the death, and noted that on the death certificate, there are three or four lines to list multiple causes of death. *Id.*, p. 487. Shea testified that a death certificate creates a rebuttable presumption of the cause of death, which can be displaced by showing that it's either incomplete or inaccurate. *Id.*, p. 488. But Shea stated that in order to do that, you have to have pathology to prove it. *Id.* According to Shea, in a death certificate, you may have opinions, but the autopsy is where the facts are. *Id.* Shea testified that if you don't have pathology to disprove the opinions in a death certificate, you are building your house on a quicksand foundation. *Id.*

{¶108} Shea explained that there are several factors to consider before accepting a case, including the complexity of the case, how many expert witnesses are required, the expense of litigation versus the potential for recovery, and the clarity of the facts of the case. *Id.*, p. 488-494.

{¶109} In April 2007, Shea received the records from Scott, but Shea's office also requested a certified copy of the medical records from Good Samaritan Hospital to make sure that it was a complete record. *Id.*, p. 494-495. From April 1 to June 15, 2007, Shea's office reviewed Jessica's records. *Id.*, p. 495. Shea sent a letter to the Siegels, dated

June 15, 2007, declining to pursue a case on their behalf. The letter states, in relevant part:

> We have spent a good deal of time reviewing the records involved with your daughter's care. Our concern is that it was very necessary to have the procedure* performed.[6] Without it being performed, your daughter would not likely be able to survive very long. You may recall, her situation had worsened by the addition of a new area of pathology. If it was not fixed, she most likely would have succumbed to it.
>
> The other side of the equation is that what happened is a risk of this procedure. The fact that there is an undesirable outcome does not change the standard of care for a physician. In other words, unless he did the procedure in an improper way, the fact there is a bad result is not something that he can be held responsible for. This is called risk of the procedure.
>
> We do not believe there is anything further that we can do. We suggest that you speak to other attorneys who may have a different opinion. Of course, there is no charge for our services.
>
> Thank you for allowing us to review this matter. I am returning the records that were provided to us.

Plaintiffs' Exhibit 14.

{¶110} Shea testified that he could not recall whether in 2007 he was aware that the autopsy did not examine Jessica's brain. Trial transcript, p. 499. However, Shea testified that in a case like this, the facts in the autopsy would be the foundation of overcoming the rebuttable presumption of the causes of death contained on the death certificate. *Id.*

{¶111} When asked why Shea did not include in his letter to the Siegels the fact that an autopsy of the brain was not performed, Shea testified that it would not be his habit to go into detail about that with grieving parents, because he would not want to imply that they made a mistake by not obtaining a full autopsy and that they were partly to blame

---

[6] Although an asterisk appears after the word "procedure," there is no footnote explaining the asterisk in the letter.

for the fact that he could not finish their case. *Id.*, p. 499-501. Shea did not know what the circumstances were around why the autopsy did not include the brain at that time. *Id.*, p. 501. Shea did not recall having any contact, either in-person or over the phone, with the Siegels. *Id.*, p. 505.

{¶112} On cross-examination, Shea testified that he has filed medical malpractice and wrongful death cases without an autopsy before, and he was able to obtain affidavits of merit in those cases. *Id.*, p. 507-508. Shea did not specifically recall the review of the Siegels' case and did not know whether he had a medical expert review the records. *Id.*, p. 508. The only things that could refresh Shea's recollection about the Siegels' case were the letters he had sent to them. *Id.*, p. 509.

{¶113} Shea testified that the only evidence that he has as to a reason for declining to take the Siegels' case is the June 15, 2007 letter, and acknowledged that in the letter, he did not mention to the Siegels that he was not accepting the case due to an incomplete autopsy. *Id.*, p. 509-510. When asked whether the Siegels would be owed that as an explanation, Shea answered not necessarily because he did not want to imply that he could not do what they wanted him to do because they didn't do something that needed to be done. *Id.*, p. 510.

{¶114} Shea acknowledged that he has various sources to obtain expert review and potential affidavits of merit, including neurosurgeons that he routinely sends cases to for review. *Id.* p. 511-512. Shea agreed that two ways to extend the statute of limitations include preparing a 180-day letter to extend the statute of limitations by six months, and preparing a pro se complaint for plaintiffs to file and then dismiss to obtain an additional year to file another timely complaint assuming service has been completed. *Id.*, p. 512-513. Shea testified that he had no recollection of Attorney Scott discussing anything about the autopsy with him. *Id.* p. 517.

{¶115} While discussing the letter he sent to the Siegels, Shea testified that after he and his staff reviewed Jessica's records, they concluded that the embolization surgery was a necessary surgery based upon Jessica's pathology; that performing the surgery itself was not malpractice; and that there was a risk of death without performing the procedure because of Jessica's condition of having an AVM. *Id.*, p. 517-519. Shea also testified that sometimes, the risk of the procedure itself results in a bad outcome, but a

bad outcome is not equivalent to malpractice. *Id.*, p. 519-520. Shea agreed that you must show a breach of a standard of care; that the breach proximately caused injury to the plaintiff; and that the plaintiff suffered damages as a result of the injury. *Id.*, p. 520. Shea stated that lacking any one of those elements means that the claim fails. *Id.* Shea testified that he was trying to tell the Siegels in his letter that he had ruled out the possibility that the brain surgery should never have been initiated to begin with because he and his staff felt strongly that that potential area of malpractice had been ruled out by the very pathology that was involved. *Id.*, p. 521-522.

{¶116} On redirect, Shea testified that what was contained in the records he reviewed was insufficient for him to get what he needed to go forward with the case. *Id.*, p. 528-529. Shea testified, "So I don't know what the facts would have been had I known what facts were in that autopsy that included the pathology in question. So I don't have an opinion that it – that it would have been there. What I'm saying is what wasn't there prevented me from being able to do much of anything more." *Id.*, p. 529.

{¶117} **Michael Djordjevic**, defendant's expert, testified that he graduated from Case Western Reserve University School of Law in 1977, was admitted to practice law in Ohio and has been in the active practice of law since then. Trial transcript, p. 688. Djordjevic began his career representing plaintiffs, then practiced for ten years defending doctors and hospitals in medical malpractice suits, then switched to representing plaintiffs in medical malpractice claims about 25 years ago. *Id.*, p. 689-691. For the past 25 years, approximately 95 percent of his cases have involved medical negligence, with about a third of those being wrongful death claims that arose from medical negligence. *Id.*, p. 691-692. Djordjevic prepared an expert report for this case. Defendant's Exhibit J.

{¶118} Djordjevic testified that the statutes of limitations that are important in a medical malpractice case involve the date of the occurrence and the date of termination of the physician/patient relationship. Trial transcript, p. 693-694. In addition, the statute of repose sets an outside limit of four years, regardless of when the relationship terminated. *Id.*, p. 694. As a general rule, the statute of limitations in a medical case is one year from the occurrence or discovery of a cognizable event or the termination of the physician/patient relationship, whichever comes last, with an outside limit of four years. *Id.* The statute of limitations for a wrongful death case is two years from the date of death.

*Id.* To a plaintiff's attorney, statutes of limitation are extremely significant, because if a case is not pursued in a timely fashion, the odds are that the court will dismiss the case and the client will no longer have a viable cause of action, regardless of the merits of the case. *Id.*, p. 694-695.

{¶119} Djordjevic testified that there are two common ways to extend the statute of limitations in medical negligence and wrongful death claims. *Id.*, p. 695-696. One way is a 180-day letter, where, by statute, if the potential defendants are given written notice informing them that the client is considering bringing a case against them, the statute of limitations will be extended or tolled for an additional 180 days. *Id.* p. 695-696. Another option is to file a lawsuit naming potential defendants, and if that lawsuit is then dismissed without prejudice and otherwise than on the merits, the case can be refiled within one year of the date of the dismissal. *Id.*, p. 696. The one-year period is known as the savings statute. *Id.*

{¶120} Djordjevic also testified that an affidavit of merit is required pursuant to Civ.R. 10(D). *Id.*, p. 697. Plaintiffs are required to file an affidavit signed by a competent expert witness who is a physician licensed by any state in the United States that devotes at least 50 percent of their time in the clinical practice of medicine in a specialty that is the same as the defendant doctor. *Id.*, p. 697. The content of the affidavit can be very general, with the requirements being that the expert would be qualified to testify, that they reviewed the pertinent materials, and that the expert opines that a breach of the standard of care was a proximate cause of injury. *Id.*, p. 698. It is not required that the physician who signs the affidavit of merit serve as an expert witness in the case if the case goes forward. *Id.* An affidavit of merit is a jurisdictional hurdle that must be overcome for the case to be filed and not dismissed. *Id.* In addition to the ways discussed to extend the statute of limitations, a plaintiff can file a lawsuit with a motion for an extension of time to file an affidavit of merit. *Id.*, p. 698-699. In Djordjevic's experience, courts usually grant plaintiffs 90 days or so to obtain an affidavit of merit with a motion for an extension of time. *Id.*, p. 699. Djordjevic added that even if a motion for an extension of time is not granted, a plaintiff could file a lawsuit and voluntarily dismiss and refile it within one year of the date of the dismissal if they initially had difficulty obtaining an affidavit of merit. *Id.*, p. 699.

{¶121} Djordjevic testified that in his field of practice, which includes hypoxic-ischemic encephalopathy injuries to infants, because of his years of experience, he and his law partner know which experts are available from whom to obtain affidavits of merit. *Id.*, p. 699-700. In a case like this, Djordjevic stated that there are services that provide experts such as neurosurgeons and interventional radiologists who could provide affidavits of merit. *Id.*, p. 700. Djordjevic stated that he has also consulted medical literature to find an expert who has written on a similar topic. *Id.* In Djordjevic's experience, it sometimes takes more than one contact with a potential expert to obtain an affidavit of merit, as different experts can review the same case and arrive at opposite conclusions about whether there was a breach of the standard of care. *Id.*, p. 700-701.

{¶122} Djordjevic stated that he has testified as an expert witness between five and eight times, with his last case involving the interaction between the statute of limitations and the statute of repose in a medical malpractice claim. *Id.*, p. 701-702. Djordjevic testified that he reviewed the materials listed in his expert report, in addition to the deposition testimony of Attorneys Scott and Shea. Defendant's Exhibit J; Trial transcript, p. 702-703.

{¶123} Djordjevic testified that he has obtained affidavits of merit for wrongful death cases where there is no autopsy. In Djordjevic's experience, it is necessary to find an expert who can testify that there was a deviation from the standard of care and that the deviation led proximately to an injury or death. *Id.*, p. 703. Generally speaking, those experts will review medical records and imaging studies, and by reviewing the records and operative notes, the experts are able to form their own opinions concerning the issues of deviation from the standard of care and proximate causation. *Id.*, p. 703-704.

{¶124} Djordjevic opined that the lack of a complete autopsy in this case was not a barrier for an affidavit of merit to be filed contemporaneously with the complaint. Djordjevic stated that although Attorney Scott consulted with an expert, that expert was unable to agree that there was a deviation from the standard of care. *Id.*, p. 704. Moreover, Djordjevic noted that the expert that Scott consulted with was not a neurosurgeon or an interventional radiologist and would not have been qualified to sign an affidavit of merit for this case. *Id.*

{¶125} Djordjevic opined that in this case, the cognizable event that would start the statute of limitations running for both medical malpractice and wrongful death was the date of Jessica's death. *Id.* Djordjevic stated that after death, there was no ongoing physician/patient relationship, so the statute of limitations for the medical malpractice case or the survival action in this case would be one year from the date of the death. *Id.* The statute of limitations for the wrongful death action would expire two years from the date of the death. *Id.*, p. 705-706.

{¶126} Djordjevic testified, over plaintiffs' objection:

> Q.      Mike, do you have an opinion to a reasonable degree of legal probability as to whether or not a reasonably resourceful plaintiffs' lawyer could have obtained an affidavit of merit and successfully filed a lawsuit in a timely manner in this case?
>
> A.      I do have an opinion.
>
> Q.      And what's that opinion?
>
> A.      My opinion is that a reasonably resourceful plaintiffs' attorney would have been able to obtain enough reviews to obtain an affidavit of merit with – within a reasonable time, specifically the time for filing as specified by the statute of limitations.

*Id.*, p. 708-709.

{¶127} Djordjevic further opined that a reasonably prudent plaintiffs' attorney could have obtained a timely affidavit of merit. *Id.*, p. 709-710. The basis for his opinion was twofold. One, in Djordjevic's own experience, and in the experience of his law partners, the absence of an autopsy or a postmortem examination or an incomplete autopsy or postmortem examination has not served as a barrier to obtaining an affidavit of merit in a timely fashion. *Id.*, p. 710. Two, Djordjevic stated that this very case shows that the lack of a complete autopsy was not a barrier to obtaining an affidavit of merit. *Id.* Djordjevic noted that plaintiffs' attorney, John Metz, was able to obtain an affidavit of merit from Dr. Citow when he filed this case in 2009. *Id.*; *see also*, affidavit of merit, dated July 22, 2009 filed with initial complaint in this case on December 16, 2009. Djordjevic added that counsel for plaintiffs has supplemented Dr. Citow's opinion with six additional expert physicians. *Id.*, p. 710-711. Djordjevic noted that a total of seven physicians have

concluded that despite the absence of a complete autopsy, there was a deviation from the standard of care medically in this case, and that the medical deviation from the standard of care was a proximate cause of Jessica Siegel's death. *Id.* Djordjevic opined that an affidavit of merit could have been and was, in fact, obtained in this case. *Id.*, p. 711.

{¶128} Djordjevic testified that neither Scott nor Shea mentioned in their letters that the incomplete autopsy was a reason for not taking Jessica's case. *Id.*, p. 711-712. Djordjevic added that if the lack of a complete autopsy was the actual reason for declining the case, it would have been prudent for those attorneys to let plaintiffs know that as well as notifying them that it might be an area for them to pursue with another attorney. *Id.*, p. 712. Djordjevic noted that both attorneys advised the Siegels of the applicable statutes of limitations when they rejected their claims and noted that the Siegels would have had time to file both medical negligence and wrongful death claims after the dates of both letters, April 1 and June 15, 2007, respectively. *Id.*, p. 712-713.

{¶129} Djordjevic did not know the precise date when the Siegels contacted their current attorney, John Metz, but was aware that the Siegels timely filed a lawsuit against the eye donation company with Metz's assistance in March 2008. *Id.*, p. 713. Djordjevic testified that in March 2008, there was still time remaining within the wrongful death statute of limitations for the Siegels to have filed a claim. *Id.*

{¶130} On cross-examination, Djordjevic agreed that one of the most important things when taking a case to investigate is to find an expert witness. *Id.*, p. 717. Djordjevic added that as a general statement, Ohio physicians in any specialty do not want to testify against other Ohio physicians. *Id.*, p. 717-718. Djordjevic agreed that there is no such thing as a simple medical malpractice case. *Id.*, p. 720. Djordjevic testified that it is not uncommon to obtain one expert witness for standard of care, another for proximate cause, and a third expert to dispute any defense that might come up during the course of the case. *Id.*

{¶131} Djordjevic testified that when investigating a potential wrongful death case, if an autopsy is available, he will review it, but he would not reject a case outright if there were no autopsy available. *Id.*, p. 721. Djordjevic stated that it is a plaintiff's burden to prove by a greater weight of the evidence the presence of both a deviation from the

standard of care and a proximate link to the injury. *Id.*, p. 722. Djordjevic agreed that expenses and costs should be considered when deciding whether to pursue a case, and that in any case there will be an investment of both time and money. *Id.*, p. 723-724.

**{¶132}** Djordjevic stated that it has been his practice to cast a broad net when sending 180-day letters because it is much easier to serve them on more people than on fewer people. *Id.*, p. 726. Djordjevic stated that it is easier to dismiss someone from a case than to add someone after the statute of limitations has expired. *Id.* Djordjevic agreed that he uses 180-day letters as a last resort and noted that you have to make sure to obtain service, so he sends them certified mail, regular mail, and tries to obtain personal service. *Id.*, p. 727.

**{¶133}** Djordjevic testified that in his experience over the last decade, his firm gets calls from either potential clients or referring attorneys that fall into three categories. *Id.*, p. 732. The first category is cases that he knows through previous experience are meritorious and are likely to be supportable by qualified experts likely to generate a settlement offer or a verdict at trial. *Id.* The second category is cases that based on prior experience are not going to win, for example, ligation of the common duct during a cholecystectomy. *Id.* The third category includes cases that he has no experience with which might be a case of first impression for his firm, in which case he explains to the client that it is potentially an expensive process, and he would require the client to finance the initial review. *Id.* If the review comes up favorably, he and his firm would assume the expenses from there on. *Id.*, p. 733. Djordjevic agreed that he and his firm cannot spend thousands of dollars for every client who calls them. *Id.*

**{¶134}** With regard to his criticisms of attorneys Scott and Shea, Djordjevic testified that if they were turning back or rejecting Jessica's case because there was some problem with the autopsy, he thinks that it would have been prudent for them to tell the parents that there was a problem with an incomplete or a deceptive autopsy, because that is what a reasonably prudent lawyer would do under those circumstances. *Id.*, p. 736. Djordjevic did not have an opinion on whether attorneys Scott or Shea breached their professional attorney standard of care; he testified that he was not there to point the finger at anyone. *Id.*, p. 736-737.

**{¶135}** With regard to the medical records in this case, Djordjevic testified:

Q.      I'm just saying that if one looks at the records as they were before Nurse Smith's deposition, one reading that would see an autopsy consent form that excludes the brain and has the father's signature on it. So wouldn't you take that to understand that the father agreed to that?

A.      Well, it's hard to – for me to answer that because I know the totality of circumstances as they unfolded in this case.  So I – so I don't really know.  I'm guessing that if in real-time I had a question as to whether or not the father knew or didn't know about the exclusion of the head, since the father was my client, I would ask.  And would say were you aware of this in real-time or how did you learn this after – something along those lines, Mr. Metz.

*Id.*, p. 739-740.

{¶136} Djordjevic testified that if he learned that the father did not want a limited autopsy and that the coroner had not been called, he would be suspicious as to what had gone on, which would make him more inclined to want to get an affidavit of merit so he could file a lawsuit and take depositions.  *Id.*, p. 742.

{¶137} With regard to Djordjevic's expert report, and his statement that nothing medically changed from the time of Jessica's death to the time of Dr. Citow's affidavit of merit, Djordjevic testified that in his opinion, none of the issues about the autopsy authorization or the limited autopsy would matter in obtaining an affidavit of merit.  *Id.*, p. 748.  Djordjevic explained that whatever changed factually regarding the autopsy and authorization for an autopsy would not have been a proximate cause of the injury in this case.  *Id.*  The affidavit of merit is separate from the desire to pursue a case.  *Id.*  The affidavit of merit requires that a competent physician state under oath that there is a deviation from the standard of care and that the deviation was a proximate cause of the injury.  *Id.*, p. 748-749.  The fact that a record may have been changed might violate the standard of care, but it would not be a proximate cause of the injury.  *Id.*, p. 749.

{¶138} Djordjevic testified that after consulting Scott and Shea, the Siegels were made aware of the fact that there were statutes of limitations that were involved in pursuing a case.  *Id.*, p. 760. Djordjevic testified that at that point, ordinary people would know that if they wanted to pursue a case, they needed to find other representation, and

in addition, file a suit or in some way extend the statute of limitations past the date that they had been given by these previous two attorneys. *Id.* Djordjevic testified that in his opinion, a reasonably prudent person would know that they had a potential case, and they would know that there were deadlines for filing a case. *Id.* Djordjevic mentioned that at least one of the letters from Scott and Shea specifically stated that the attorney was not intending to tell the Siegels that there was not merit to their case, only that he was not interested in pursuing it. *Id.*, p. 761. In Djordjevic's opinion, he does not think the Siegels should have filed a case, but if they wanted to pursue a case, they would have had to find another attorney who was willing to pursue a case and file it in a timely manner. *Id.*

{¶139} Djordjevic testified that when he issues a turn back letter, he informs potential clients that they have one year from the date of the negligent act, the cognizable event or the termination of the physician/patient relationship. *Id.*, p. 766. Then it is up to the client to know which of those dates would be the last. *Id.* Djordjevic stated that he tries to cover his bases by giving that information to potential clients. *Id.*, p. 767.

**Plaintiffs' Medical Experts**

{¶140} Plaintiffs submitted the video depositions and corresponding written deposition transcripts of medical experts that plaintiffs obtained for this case. The magistrate issued rulings on the objections contained in their depositions in an order dated December 20, 2023. The magistrate will give the following summaries of their relevant testimony.

{¶141} **Jonathan Citow, M.D.**, the physician who signed the affidavit of merit that plaintiffs filed with their December 16, 2009 complaint, is licensed to practice medicine in the state of Illinois and is board certified in neurosurgery. *See* December 16, 2009 Complaint; Plaintiffs' Exhibit 36, October 19, 2023 Deposition of Dr. Citow. Dr. Citow testified that he was able to render the opinions contained in his expert report to a reasonable degree of medical probability, based upon the professional standard of care that was in effect in 2006 for a neurosurgeon in this type of case and under these circumstances, after reviewing the medical records from both Good Samaritan Hospital and Children's Hospital Medical Center, the radiological films, scans, CTs, angiography, and other radiological films from both hospitals, the depositions of Dr. Ringer,

Nurse Smith, Dan and Fran Siegel, and the office records from Mayfield.  October 19, 2023 Citow deposition, p. 14-26.  Dr. Citow further testified that in July 2009, he was able to offer an opinion that Dr. Ringer breached the standard of care and that breach caused injury to Jessica.  *Id.*, p. 37; *see also*, affidavit of merit dated July 22, 2009, filed with plaintiffs' complaint.  Dr. Citow further testified that he could have rendered the same opinion if the medical records were made available to him in 2007 or 2008, because nothing changed in the medical records that he reviewed.  *Id.*  Dr. Citow also testified that it would have been obvious to him or anyone else looking at the autopsy report that it was not a complete autopsy.  *Id.*, p. 38*.*  Dr. Citow further stated that the alleged modification or alteration to the autopsy authorization did not cause any injury to Jessica because at that time, she was already deceased.  *Id.*, p. 47-48*.*

{¶142} **Steven Hetts, M.D.**, a professor of radiology, biomedical imaging, and neurological surgery at U.C. San Fransisco, was provided with the Good Samaritan medical records for July and August 2006, the Children's Hospital medical records, all the radiological films for both hospitals, and the Mayfield office visit records.  Plaintiffs' Exhibit 35, October 18, 2023 deposition of Dr. Hetts, p. 54.  Based upon a review of those materials, Dr. Hetts testified that he was able to provide his opinions on standard of care and causation without a complete autopsy.  *Id.*, p. 7, 78.  Indeed, Dr. Hetts put together a PowerPoint slideshow of the individual angiograms and images of Jessica's brain in the medical records from August 14, 2006, through the date of her death in chronological order to explain his testimony during his deposition.  *Id.*, p. 30-51.  *See also*, video deposition of Dr. Hetts, taken on October 18, 2023.  Dr. Hetts agreed that modifying the autopsy authorization did not cause injury to Jessica and did not cause her death.  *Id.*, p. 78.

{¶143} **Karel ter Brugge, M.D.**, a professor of radiology and surgery and chair of the interventional radiological department at the University of Toronto until his retirement in 2016, who devoted his professional life to the treatment of AVMs, testified that if he had reviewed this matter for Mr. Metz closer to the time when it happened, in 2006, 2007, or 2008, he could have offered the same opinions that he has today about whether Dr. Ringer met or did not meet the applicable standard of care.  Plaintiffs' Exhibit 33, October 24, 2023 deposition of Dr. ter Brugge, p. 8-9, 55, 69.  Dr. ter Brugge testified that

he reviewed the same set of facts that he would have reviewed back in that time because nothing factually as far as the medical records has changed. *Id.*, p. 69.

{¶144} **Alejandro Berenstein, M.D.**, who is board certified in radiology, diagnostic radiology and neuroradiology, is a professor of radiology neurosurgery in pediatrics at the Icahn School of Medicine in New York City, and practices as an interventional radiologist or endovascular neurosurgeon, testified that he was able to give his opinions on standard of care without there being a complete autopsy, and believed that any reasonably competent neurological surgeon could do the same if provided with the same records. Plaintiffs' Exhibit 34, Dr. Berenstein's October 25, 2023 deposition, p. 1-15, 47-48. In addition, Dr. Berenstein testified that this could have been done back in 2006, 2007, or 2008. *Id.* Dr. Berenstein stated that an autopsy will confirm a medical opinion as to cause of death, and the fact that the brain was excluded in this case was puzzling to him. *Id.*, p. 58-59.

{¶145} Although the magistrate has determined that neurosurgeon **J. Martin Barrash, M.D.**, did not meet the requirements of an expert witness and has ruled that his deposition shall not be admitted, Dr. Barrash testified that in his opinion, Jessica died from the hematoma from the embolization, and he was able to reach that opinion from the portion of the medical records that he reviewed. Plaintiffs' Proffered Exhibit 37, October 20, 2023 deposition of J. Martin Barrash, M.D., p. 68. Dr. Barrash further stated that if he had been provided with the medical records in 2006, 2007, or 2008, he could have formulated the same opinion. *Id.*, p. 68-71.

{¶146} **Carl Schmidt, M.D.**, a board-certified anatomic clinical and forensic pathologist who practiced at the Wayne County Medical Examiner's Office in Detroit, Michigan, until 2022, testified that in his opinion, Jessica's brain should have been autopsied in this case because the brain was the organ that was the subject of diagnosis and treatment. October 23, 2023 deposition of Carl Schmidt, M.D., Plaintiffs' Exhibit 38, p. 26-27. Dr. Schmidt stated that an autopsy of the brain would have allowed correlation between the radiologic changes and what would have been found in a neuropathologic examination. *Id.*, p. 29. Dr. Schmidt stated that additional injury to the central nervous system caused by a diffuse swelling in the brain and what was essentially a large iatrogenic hemorrhagic stroke would have been documented. *Id.*, p. 29-30. Dr. Schmidt

stated that if you look at how swollen the brain was, then you could see the damage that was caused by the hemorrhage as well as the consequences of the swelling of the brain that may not be as well documented by a radiologist. *Id.*, p. 30.

{¶147} In Dr. Schmidt's opinion, it was more likely that the extensive injury to Jessica's brain caused her high temperature, not the possible condition of malignant hyperthermia. *Id.*, p. 31. Dr. Schmidt opined that if the brain itself had been examined during the autopsy, the extensive brain injury would have been documented. *Id.*

{¶148} Dr. Schmidt testified that it would be below the professional standard of care for a physician to intentionally limit the autopsy to exclude the brain and head without informing the family, if the family's wishes were to obtain a complete autopsy. *Id.* p. 34. Dr. Schmidt testified that an examination of the brain would allow for further documentation of compression of the hypothalamus and brain stem, as indicated on the existing radiological scans of Jessica's brain. *Id.*, p. 34-35. Dr. Schmidt testified that the hypothalamus helps with thermal regulation, and if there is injury to that part of the brain, you can lose temperature control and that can be a reason for the hyperthermia. *Id.,* p. 35*.* Dr. Schmidt disagreed with Dr. Wang's opinions about the cause of Jessica's death, and Dr. Wang's statement that it was not unreasonable to exclude the brain from the autopsy in this case. *Id.*, p. 48-51.

{¶149} On cross-examination, Dr. Schmidt testified that he was able to formulate an opinion as to the cause of Jessica's death, even without a complete autopsy, because he had ample documentation from some of the imaging as well as clinical documentation. *Id.*, p. 69-70. Dr. Schmidt also agreed that the cause of death listed on the death certificate was accurate. *Id.*, p. 70. Dr. Schmidt agreed that a patient with ventilator-induced pneumonia will more than likely have a fever. *Id.*, p. 72. Dr. Schmidt testified that with regard to his opinions on the cause of death, he could have formulated the same opinions if the same information had been provided to him in 2007 or 2008, even without a complete autopsy. *Id.,* p. 75.

{¶150} **Amber Wang, M.D.**, defendant's expert witness, testified that she is employed by the Maricopa County medical examiner's office in Phoenix, Arizona as a full-time medical examiner. Trial transcript, p. 815. Defendant's Exhibit L is her CV. *Id.*, p. 816. Dr. Wang is board certified in anatomic pathology, neuropathology and forensic

pathology, and serves as a clinical professor of pathology at the University of Arizona College of Medicine. *Id.*, p. 818. Dr. Wang has participated in thousands of autopsies in her career. Id., p. 819. Dr. Wang's expert report is Defendant's Exhibit K. *Id.*, p. 821. Dr. Wang has testified as an expert between five and ten times before, concerning cause of death. *Id.*, p. 822. Dr. Wang reviewed Jessica's medical records, the autopsy report, the death certificate, and the expert reports of Dr. Carl Schmidt. *Id.*, p. 822-823.

{¶151} In this specific case, Dr. Wang opined that an examination of the head and brain was not necessary. *Id.*, p. 823-824. Dr. Wang stated that the cause of death was apparent based upon Jessica's clinical course and the documentation from the hospital. *Id.*, p. 824. Dr. Wang opined that if the brain had been examined, it would have revealed the things that were already shown radiographically, such as the AVM, operative site, the clips or coils used for the procedure, softening around the craniectomy, and it may have shown some residual hemorrhage which were all documented radiographically. *Id.*, p. 824-825. Dr. Wang was able to form a professional opinion as to cause of death without a complete autopsy in this case, based on Jessica's clinical course, which was well-documented in the medical records, along with the existing autopsy. *Id.*, p. 825-826. Dr. Wang opined that the cause of death was gram-negative rod sepsis and methicillin sensitive staphylococcus aureus pneumonia in the postoperative setting of cerebral AVM embolization. *Id.*, p. 826-827. Dr. Wang explained that Jessica had documented infections in her body at the time of her death, including bacteria that was detected in her bloodstream and her lungs. *Id.*, p. 827. Dr. Wang also stated that there was radiographic evidence of a pneumonia during Jessica's hospitalization, which is a complication of surgery that is frequently seen in a patient that has been intubated for a period of time. *Id.* Dr. Wang stated that sepsis and pneumonia caused Jessica to have a significant fever, and that they occurred in the setting of her AVM embolization. *Id.* Dr. Wang stated that she could rule out malignant hyperthermia to a significant degree of certainty, but she could not completely rule it out. *Id.*, p. 828. Dr. Wang explained that fifty percent of people with malignant hyperthermia have a genetic mutation which makes them susceptible to malignant hyperthermia with anesthetics. *Id.* Since Jessica did not have a family history of that, Dr. Wang thought it would be unlikely that Jessica suffered from

malignant hyperthermia.  *Id.*  Dr. Wang was able to rule out pulmonary embolism because of the results of the autopsy.  *Id.*

{¶152} To support her opinion that Jessica died of sepsis, Dr. Wang pointed to the cultures obtained during Jessica's hospitalization that were positive for methicillin sensitive staph aureus pneumonia.  *Id.*  Jessica was also markedly febrile throughout the day of her death.  *Id.*  Dr. Wang opined that it was not unreasonable to exclude the head from the autopsy in this case, because Jessica's death was related to her hyperthermia or her fever at the end of life.  *Id.*, p. 830.  According to Dr. Wang, there were three causes that needed to be considered that would have produced such a high fever: 1) Malignant hyperthermia, which is probably not related in this case; 2) sepsis and pneumonia, which are confirmed in this case; and 3) neurogenic fever, which she could not definitively rule out but may have played a role and goes along with a complication of her AVM, which occurs when there is an injury to the brain, specifically the hypothalamus which regulates body temperature and can drastically increase a temperature in someone.  *Id.*  Dr. Wang stated that neurogenic fever is usually diagnosed when someone does not have signs of an infection, and we know that Jessica had signs of an infection.  *Id.*  Dr. Wang stated that regardless, all three of these possibilities cannot be sorted out based upon an examination of the brain.  *Id.*, p. 830-831.  Dr. Wang stated that Jessica's metabolic and respiratory acidosis were signs of multiorgan failure and were related to her febrile state.  *Id.*  Dr. Wang opined that it was more probable that Jessica was hyperthermic because of sepsis, not because of neurogenic fever.  *Id.*, p. 831-832.  Dr. Wang noted that even though Dr. Schmidt has a different opinion as to Jessica's cause of death, both she and Dr. Schmidt were able to form an opinion as to Jessica's cause of death without an autopsy of the brain.  *Id.*, p. 832.  Dr. Wang further opined that a reasonably prudent pathologist would have also been able to come to an opinion about Jessica's cause of death from 2006 through 2008 without an autopsy of the brain.  *Id.*, p. 833.

{¶153} On cross-examination, Dr. Wang stated that she had not read Dr. Ringer's depositions or talked to him, and that she had not read Dr. Beckman's deposition.  *Id.*, p. 834-835.  Dr. Wang agreed that a complete autopsy provides more information than a limited one but stated that a complete autopsy is not always necessary to determine the cause of death.  *Id.*, p. 836-837.  Dr. Wang agreed that Dr. Ringer's order to rule out a

pulmonary embolism vs. malignant hyperthermia did not prohibit a full autopsy from being conducted. *Id.*, p. 838. Dr. Wang agreed that Jessica's death occurred from medical treatment of AVM, as stated on the handwritten death certificate, Plaintiffs' Exhibit 8B. *Id.*, p. 842. Dr. Wang stated that acute hemodynamic collapse following tracheostomy is a mechanism of death rather than a cause of death, and that the causes of death are accurately reflected on the death certificate. *Id.*, p. 843. Dr. Wang stated that if the brain had been examined, there may have been new findings, but it would not alter Jessica's cause of death.

{¶154} On redirect, Dr. Wang agreed that Dr. Beckman's testimony that lung disease contributed to Jessica's death was consistent with her determination that the cause of death was pneumonia and sepsis. *Id.*, p. 868. On recross, Dr. Wang clarified that hospital autopsy reports are different than forensic autopsy reports in that hospital pathologists very rarely give a cause of death; their main role is to document illness or injury. *Id.*, p. 871-872. Dr. Wang agreed that Dr. Beckman listed his findings, Dr. Ringer listed his opinions on the certificate of death, and Dr. Wang found a cause of death. *Id.*, p. 872.

{¶155} **Steven Sunderland, PhD**, a grief educator, testified that he met with the Siegels in April 2023 and wrote a report as a result of their sessions. Plaintiffs' Exhibit 40, October 16, 2023 deposition of Steven Sunderland, PhD, p. 17. The report refers to the grief the Siegels experienced as a result of Jessica's death, and then, later, how their grief changed to a sense of distrust regarding Dr. Ringer. *Id.*, p. 17-37. Dr. Sunderland stated that the grief in this case is unique, because it involves justice. *Id.*, p. 40-41. Dr. Sunderland opined to a reasonable degree of probability that Dr. Ringer's actions caused the Siegels serious emotional distress above and beyond the normal grief process, and that the emotional distress for Daniel Siegel was permanent but that Frances Siegel will find ways of weathering this situation. *Id.*, p. 42-43. On cross-examination, Dr. Sunderland testified that he is not a psychologist, psychiatrist, licensed professional clinical counselor, or social worker. *Id.*, p. 45-46. However, Dr. Sunderland stated that he is able to separate the grief the Siegels have experienced from Jessica's death from any grief that they have suffered because of the alleged fraud of Dr. Ringer in changing the autopsy authorization. *Id.*, p. 58-59. Dr. Sunderland testified that in his

opinion, the Siegels suffered twice as much grief from the miscommunication from Dr. Ringer about the risks of the procedure and the limitation on the autopsy than they did from the death of Jessica. *Id.*, p. 61-62.

{¶156} **Sheila Munafo Kanoza** and **Linda Sullivan** both testified about the grief that the Siegels experienced based upon their participation in different bereavement and grief support groups with them.  **Kristen Lane**, Frances and Daniel Siegel's older daughter, also testified about how Jessica's death affected their family.

**Defendant's Motions at Trial**

{¶157} After plaintiffs rested their case, defendant made an oral motion for dismissal pursuant to Civ.R. 41(B)(2), on the grounds that upon the facts and the law, plaintiffs have shown no right to relief.  Trial transcript, p. 663-664.  Specifically, with regard to the fraud claim, defendant argued that there is no evidence that the Siegels justifiably relied on any alleged misrepresentation from Dr. Ringer, because the Siegels testified that they learned of the change to the autopsy authorization as early as April 2007, not December 17, 2008, as alleged throughout this case.  *Id.*, p. 664.  Defendant argues that Frances Siegel testified that she saw the autopsy report which stated "no head," and that the eyes had been taken, and that at that time, she had a copy of Jessica's medical records with a copy of the authorization for autopsy which showed that the autopsy had been limited to the thorax and abdomen.  *Id.*  Defendant further argued that Frances Siegel's testimony is consistent with Daniel Siegel's April 2023 deposition testimony, where he testified that he learned that fraud had been committed by Dr. Ringer when he saw the "scratched out" portion on the authorization for autopsy as early as April 2007.  *Id.*

{¶158} Defendant further argued that plaintiffs cannot show any resulting injury proximately caused by any reliance on Dr. Ringer's alleged misrepresentations because the medical malpractice and wrongful death claims have been dismissed.  *Id.*, p. 665. Defendant argues that any damages that plaintiffs have in this case are based on Jessica's death, and because the medical malpractice and wrongful death claims have been dismissed, there is no resulting injury from any reliance on Dr. Ringer's alleged misrepresentations.  *Id.*  With regard to the spoliation claim, defendant argues that

plaintiffs have failed to prove any damages because one element of a spoliation claim is proof that the destroyed evidence disrupted the underlying case. *Id.* Again, because plaintiffs' underlying claims of medical malpractice and wrongful death were dismissed due to the statute of limitations, defendant asserts that plaintiffs cannot prove an essential element of a spoliation claim. *Id.* Defendant also moved to renew the motions for summary judgment from July 28, 2022, and May 19, 2023, based on the above arguments and the timing of when the Siegels learned that alleged fraud and spoliation were committed. *Id.*, p. 666. Defendant further moved to renew the supplemental motion for summary judgment of June 16, 2023, wherein defendant argued that if Dr. Ringer is found to have committed fraud, he would lose his immunity from suit, and defendant would not be found liable for his conduct. *Id.* Counsel for plaintiffs set forth his arguments in opposition to defendant's motions and the magistrate declined to render any judgment until the close of all the evidence, pursuant to Civ.R. 41(B)(2).

**Law and Analysis**

**Spoliation**

{¶159} The Supreme Court of Ohio has recognized the tort of spoliation of evidence. *Smith v. Howard Johnson Co., Inc.*, 1993-Ohio-229. In *Howard Johnson*, the Supreme Court stated the following:

"The United States District Court, Southern District of Ohio, Eastern Division, pursuant to S.Ct.Prac.R.XVI, has certified the following questions to us:

'1. Does Ohio recognize a claim for intentional or negligent spoliation of evidence and/or tortious interference with prospective civil litigation?

'2. If so,

'a. What are the elements of such a claim; and

'b. Does such a claim exist between the parties to the *primary action* (*i.e.*, the action in which the spoliated evidence would have been used), or does it only exist against third-party spoliators?

'3. If the answer to 2(b) is that such a claim exists between the parties to the primary action, may such a claim be brought at the same time as the *primary claim, or must the victim of spoliation await an adverse judgment*?'

{¶160} "We answer the three questions as follows:  (1) A cause of action exists in tort for interference with or destruction of evidence; (2a) the elements of a claim for interference with or destruction of evidence are (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) *disruption of the plaintiff's case*, and (5) damages proximately caused by the defendant's acts; (2b) such a claim should be recognized between the parties to the *primary action* and against third parties; and (3) such a claim may be brought at the same time as the *primary action*.  See *Viviano v. CBS, Inc.* (1991), 251 N.J. Super. 113, 126, 597 A.2d 543, 550."  (Emphasis added.)  *Howard Johnson*, 1993-Ohio-229 at * 29.

{¶161} In addition, "a spoliation claim in Ohio cannot succeed in the absence of a viable underlying claim." *Johnson v. Plastek Indus., Inc.*, 2019 U.S. App. LEXIS 6096 (6th Cir. Feb. 27, 2019), citing *Jeffrey Mining Prods., L.P. v. Left Fork Mining Co.*, 143 Ohio App.3d 708 (8th Dist.2001).

{¶162} An analysis of a prima facie case of spoliation shows the following.  The magistrate finds that on August 23, 2006, even though Dr. Ringer testified that he did not think that the Siegels would file a lawsuit against him for the care and treatment that he rendered to Jessica, a reasonable person would believe that there would be probable litigation involving plaintiffs.  Jessica was 16 years old, and she died after having undergone brain surgery.  Litigation is probable when someone dies after a surgical complication.  In addition, Jessica's death was the first death that Dr. Ringer had experienced after an embolization procedure.  The magistrate finds that a reasonable physician who had recently performed brain surgery on a patient who soon thereafter dies would have knowledge that litigation was probable, even if Dr. Ringer did not specifically predict or expect litigation.  Therefore, the first and second elements of a spoliation claim: (1) pending or probable litigation involving the plaintiff, and (2) knowledge on the part of defendant that litigation exists or is probable, have been shown by a preponderance of the evidence.

{¶163} The third element of a spoliation claim is willful destruction of evidence by defendant designed to disrupt the plaintiff's case.  The magistrate finds that Dr. Ringer excluded Jessica's brain from the autopsy knowing that he could have ordered a complete

autopsy and still obtained information regarding his differential diagnoses. Indeed, Dr. Ringer admitted that nothing prevented him from ordering a complete autopsy. Nurse Smith assumed that Dr. Ringer would order a complete autopsy until Dr. Ringer told her that he did not want one. Dr. Beckman testified that a complete autopsy is preferred over an incomplete autopsy. And the Siegels testified that they gave permission for a complete autopsy and expected one. The magistrate further finds that even though there were multiple imaging studies of the brain, in fact, the very studies relied on by plaintiffs' medical experts in this case to support their conclusions that Dr. Ringer deviated from the standard of care, Dr. Ringer made a conscious choice to exclude the brain from the autopsy. Although Dr. Ringer explained his reasoning for limiting the autopsy, including that there were ten CT scans of Jessica's head from August 14 through 23, 2006, and that an autopsy of her brain would not add anything to the analysis, the magistrate is persuaded by other medical professionals who testified in this case, including Dr. Schmidt and Dr. Beckman that an examination of the brain would have provided useful information. At best, it would have provided more detailed evidence of the brain damage that Jessica experienced, and more precise evidence on which to form medical opinions on cause of death. At worst, it would have provided duplicative evidence that is already contained in the medical record and imaging studies. We will never know what it would have shown with certainty, because Dr. Ringer excluded the brain from examination. Dr. Ringer may have been correct that nothing in Jessica's brain could explain her sudden and unexpected death. But his choice to exclude the brain resulted in the destruction of evidence that may have yielded helpful information for the Siegels. Whether Dr. Ringer acted willfully to destroy evidence in a design to disrupt plaintiffs' case is a question that cannot be answered with certainty. The evidence in Dr. Ringer's favor includes the two letters he sent the Siegels after Jessica's death, and the fact that he requested permission for an autopsy after the coroner's office declined to conduct one. However, in this case, whether Dr. Ringer willfully destroyed Jessica's brain to disrupt plaintiffs' case is of no consequence, because plaintiffs have failed to prove, by a preponderance of the evidence, the fourth element of a spoliation claim: that the destruction of Jessica's brain disrupted plaintiffs' underlying case.

{¶164} Both the First District and the Tenth District Courts of Appeals have found that plaintiffs' claims for medical malpractice and wrongful death are time-barred. The reason that an autopsy of Jessica's brain mattered was to support plaintiffs' claims of medical malpractice and wrongful death against Dr. Ringer, and by extension, defendant, University of Cincinnati College of Medicine. As a matter of law, because plaintiffs failed to timely file their claims of medical malpractice and wrongful death based upon Dr. Ringer's conduct, there is no primary action or viable, underlying claim that could be disrupted. In *Howard Johnson, supra*, the question for the Supreme Court was whether a claim for spoliation had to wait until the primary action failed on its merits because of the lack of destroyed evidence, or, whether both claims could be brought at the same time. The Supreme Court found that both claims could be brought at the same time. But the Supreme Court did not state that plaintiffs could file a spoliation claim without timely filing a primary action, in this case, a claim for medical malpractice or wrongful death, where the evidence that was destroyed would have been used.

{¶165} In this case, the Siegels knew that their daughter died after brain surgery in August 2006. The Siegels knew that they had given permission for a complete autopsy to be conducted. And by December 2006 or January 2007, the Siegels knew that the autopsy report came back without an examination of Jessica's head, and that "there was no permission for removal of the brain" despite the Siegels' knowledge that they did, in fact, give permission for the removal of the brain, and their expectation that a complete autopsy would be conducted. The magistrate finds that the Siegels understood that they had given permission for examination of Jessica's brain during the autopsy. The Siegels testified that they learned that Jessica's eyes had been harvested when they read the autopsy report. ("The eyes have been removed for transplantation." Plaintiffs' Exhibit 7, p. 2.) The Siegels testified that they did not know what "no head" meant, but the magistrate finds that a reasonable person, even without a medical background, would or should have known that "<u>Autopsy Restrictions</u>: None NO HEAD," and "[t]here was no permission for removal of the brain" meant that Jessica's brain was not examined in the autopsy. The Siegels testified that they wanted and expected a complete autopsy. It logically follows that they knew that they had given permission for removal of the brain, and when the autopsy report stated that no permission was given, that statement would

put a reasonable person on notice that something was wrong and needed further investigation.

{¶166} The evidence in the record now shows that the Siegels did, in fact, have questions about the autopsy, and they sought legal counsel in January 2007, before any statute of limitations had expired. Attorney Scott explained his reasons for not taking the Siegels' medical malpractice and wrongful death cases in the letter that he sent them on April 1, 2007. Plaintiffs' Exhibit 13F. Scott then explained the statutes of limitations for medical malpractice and wrongful death claims. *Id.* Attorney Scott testified that the lack of a complete autopsy was not the sole reason to decline to investigate Jessica's case any further. Trial transcript, p. 340. Scott did not testify that the lack of an autopsy of the brain prevented him from timely filing a medical malpractice or wrongful death claim on behalf of the Siegels.

{¶167} Furthermore, neither Attorney Scott nor Shea specifically stated in their letters to the Siegels that the lack of an autopsy of Jessica's brain was the reason why they would not accept the case. Plaintiffs' Exhibits 13F and 14. Indeed, Attorney Shea cited the fact that it was necessary for Jessica to have the brain surgery, that she would not likely have survived without the procedure, and that what happened was a risk of the procedure. Plaintiffs' Exhibit 14. The magistrate finds that if the lack of an autopsy of the brain were the main reason that the attorneys would not take the case, the attorneys would have stated as much in their letters.

{¶168} Moreover, the magistrate finds that the evidence in this case now shows that the Siegels did, in fact, know that Jessica's brain had not been examined when they sought legal advice from both Attorneys Scott and Shea. Indeed, when Attorney Scott sent the medical records, autopsy report, death certificate and notes that the Siegels had provided (but were not provided at trial), to Attorney Scott's medical reviewer, Dr. Syzek, Dr. Syzek stated in his recorded phone call that "there is also some confusion over that the father give [sic] consent or request not to have consent so I think there is an issue over the family felt that they gave consent and yet I didn't see it, but apparently there is something in there where it is checked no autopsy on the brain." Plaintiffs' Exhibit 13E, p. 5. The magistrate notes that this statement shows that when the Siegels provided records to Attorney Scott, they raised the issue that Jessica's brain had not been

autopsied. This explains Dr. Syzek's comment that there was confusion over giving consent to examine the brain. This statement in the recorded phone call is one more piece of evidence that proves that the Siegels had actual notice that Jessica's brain was not examined during the autopsy as early as January 2007. Although the Siegels have testified repeatedly that they first discovered that Dr. Ringer had limited the autopsy during Nurse Smith's deposition which was held on December 17, 2008, the evidence now shows that the Siegels knew that Dr. Ringer performed brain surgery on Jessica, that Jessica died after the brain surgery, that Dr. Ringer requested an autopsy, that the Siegels gave permission for a complete autopsy, that the autopsy report did not include the brain, and that an examination of the brain would have been used as evidence in a medical malpractice/wrongful death claim. The Siegels were able to find their current attorney, John Metz, who obtained an affidavit of merit, medical experts, and pursued claims of medical malpractice and wrongful death without an autopsy of the brain. The magistrate finds that Attorney Djordjevic's testimony was credible and persuasive that the actions that Attorney Metz has taken in this very case show that the lack of an autopsy of the brain did not disrupt the underlying case: the failure to file the underlying case timely after being notified of the applicable statutes of limitations was the reason that the underlying case failed. The magistrate finds that the lack of an autopsy of Jessica's brain did not disrupt plaintiffs' underlying case. Plaintiffs have not brought forth any credible evidence to explain why they did not timely file a medical malpractice or wrongful death claim. Plaintiffs have failed to meet the required elements for a spoliation claim. Therefore, the magistrate recommends judgment in favor of defendant on plaintiffs' spoliation of evidence claim.

**Fraud**

{¶169} "The elements of an action in actual fraud are: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance

upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55 (1987).

{¶170} Plaintiffs assert that Dr. Ringer committed fraud in the following ways: (1) When Dr. Ringer represented that a complete autopsy would be conducted; (2) when Dr. Ringer represented that the coroner was contacted but declined an autopsy; (3) when Dr. Ringer signed the progress notes indicating that the coroner declined an autopsy; and (4) when Dr. Ringer told the Siegels at their meeting on January 17, 2008 that he did not know why Jessica's brain and head were excluded from the autopsy. Plaintiffs' January 25, 2024 Post Trial Brief, p. 4. The magistrate will address plaintiffs' second and third arguments first.

## Did Dr. Ringer Falsely Represent That the Coroner's Office Was Contacted and Declined the Case?

{¶171} For the reasons stated previously, the greater weight of the evidence shows that Dr. Levine contacted the coroner's office, and the case was declined. The magistrate finds that Dr. Levine's testimony on this point was credible, and that both Drs. Levine and Ringer complied with the reporting requirement as set forth in the hospital policies. The magistrate further finds that Nurse Smith's deposition testimony and exhibits, including a form in the death packet where she indicated that it was not a coroner's case, and the transcript of her phone call with the organ donation company noting that a phone call was being made to the coroner's office at that time, show that despite the Hamilton County Coroner's Office not having a death record of Jessica Siegel, a call was made. Therefore, plaintiffs have failed to establish the first element of a fraud case regarding whether the coroner's office was contacted.

## Did Dr. Ringer Falsely Sign the Progress Notes Indicating That the Coroner Declined an Autopsy When That Was Not True?

{¶172} For the reasons stated previously, the greater weight of the evidence shows that the coroner's office declined the case, even though there is no death record for Jessica Siegel. Again, the magistrate finds that the testimony of Dr. Levine and Nurse Smith was credible on this point. The magistrate finds that plaintiffs have failed to

establish the first element of a fraud claim regarding whether Dr. Ringer falsely signed progress notes.

**Dr. Ringer's Representation That a Complete Autopsy Would Be Conducted**

**Was there a representation or concealment of a fact where there is a duty to disclose?**

{¶173} The evidence shows that Dr. Ringer asked Daniel Siegel for his consent to conduct an autopsy. The evidence also shows that Dr. Ringer had specific questions about Jessica's sudden and unexpected death, including his differential diagnoses that she suffered either a sudden cardiac event, a pulmonary embolism or malignant hyperthermia. Dr. Ringer discussed those possibilities with Daniel Siegel. Daniel Siegel signed an authorization for a complete autopsy. Dr. Ringer had Nurse Smith limit the autopsy to an examination of the thorax and abdomen with a muscle biopsy after Daniel Siegel left the hospital. Dr. Ringer did not notify the Siegels of that limitation. The Siegels expected that a complete autopsy would be conducted when they left the hospital on August 23, 2006. The magistrate finds that Dr. Ringer's decision to limit the autopsy should have been explicitly communicated to the Siegels. It was not. The magistrate finds that plaintiffs have established the first element of fraud with regard to whether a complete autopsy would be conducted.

**Was the representation that a complete autopsy would be conducted material to the transaction at hand?**

{¶174} The magistrate finds that the representation that a complete autopsy would be conducted was material to the Siegels, because they gave consent for a complete autopsy after Jessica had undergone a brain procedure, and the Siegels wanted an autopsy to include Jessica's brain because they wanted to know why she died. The magistrate finds that an examination of Jessica's brain during the autopsy would have revealed more detailed information about the condition of Jessica's brain and could have resulted in useful information to support a claim of medical negligence and wrongful death regarding Dr. Ringer's care and treatment of Jessica during her hospital stay. The magistrate finds that plaintiffs have met the second element of fraud.

**Was Dr. Ringer's representation that a complete autopsy would be conducted made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred?**

{¶175} The magistrate finds that because Dr. Ringer did not explicitly tell the Siegels that he intended to limit the autopsy, that Daniel Siegel signed an authorization form to have a complete autopsy conducted, and that Dr. Ringer chose to limit the autopsy after the Siegels left the hospital and did not inform them that the autopsy would be limited, the third element of a fraud claim is met in this instance. Furthermore, Dr. Ringer's statement to Nurse Smith that he did not want a complete autopsy shows that if that was his intent, Dr. Ringer should have communicated this fact when he discussed his intentions with Daniel, knowing that the form stated "complete autopsy" and knowing that he had performed brain surgery on Jessica shortly before her death. The magistrate finds that the third element of fraud has been met.

**Was Dr. Ringer's representation that a complete autopsy would be conducted made with the intent of misleading another into relying upon it?**

{¶176} The magistrate finds that when Dr. Ringer asked for consent to conduct an autopsy, and Daniel Siegel agreed and signed the authorization form with no limitation, Dr. Ringer's lack of clarity had the effect of the Siegels relying on the representation that a complete autopsy would be conducted. Dr. Ringer testified that it was his intent to explore his differential diagnoses that he discussed with Daniel Siegel, and that an examination of Jessica's brain was not necessary because it would add nothing to the analysis. Although Dr. Ringer's intent was to find out what caused Jessica's sudden death, his decision to limit the autopsy was not communicated to the Siegels before the autopsy was conducted. Therefore, the magistrate finds that the Siegels relied on the representation that a complete autopsy would be conducted. The magistrate finds that the fourth element of fraud has been met.

**Was there justifiable reliance upon the representation or concealment?**

{¶177} The magistrate finds that the Siegels were justified in relying on the representation that a complete autopsy would be conducted when they left the hospital, for the same reasons as stated above. However, the magistrate finds that once the Siegels were provided with a copy of the autopsy report which clearly stated that there was no permission for removal of the brain, a reasonable person could no longer justifiably rely on Dr. Ringer's representation that a complete autopsy would be conducted. In essence, any justifiable reliance upon Dr. Ringer's representation that a complete autopsy would be conducted became unjustifiable in December 2006 when the Siegels were provided with a copy of the autopsy report. The magistrate finds that by December 2006, any justifiable reliance that the Siegels had that Jessica's brain would be examined in the autopsy was no longer justifiable.

### Was there a resulting injury proximately caused by the reliance?

{¶178} The magistrate finds that the injury that was proximately caused by the Siegels' reliance that a complete autopsy would be conducted was the lack of a forensic examination of Jessica's head and brain. The magistrate finds that this injury would have been apparent to a reasonable person when the autopsy was provided to the Siegels in December 2006. However, since the Siegels did not timely file a medical malpractice or wrongful death claim after having actual notice that Jessica's brain was not examined in the autopsy, plaintiffs have failed to prove a resulting injury was proximately caused by the reliance. Again, plaintiffs have failed to present credible evidence that the lack of an autopsy of Jessica's brain prevented them from timely filing any claims about Dr. Ringer's medical treatment of Jessica. The resulting injury from their reliance on Dr. Ringer's representation that Jessica's brain would be examined became apparent by December 2006, when the autopsy report clearly showed that the brain was not examined. The magistrate finds that plaintiffs cannot prevail on a fraud claim because they have failed to show a resulting injury proximately caused by their reliance. In the final analysis, the Siegels have presented no credible evidence that the lack of an autopsy of the brain prevented them from timely filing their claims of medical malpractice and wrongful death: the very claims that would be supported by an autopsy of the brain. Therefore, the magistrate finds that plaintiffs have failed to establish the final element of a fraud claim.

**Dr. Ringer's Statements in The January 17, 2008 Meeting That He Did Not Know Why the Brain Was Not Examined**

**Was there a representation or concealment of a fact where there is a duty to disclose?**

{¶179} The magistrate finds that there is a factual dispute whether Daniel Siegel and his sister-in-law asked Dr. Ringer why Jessica's brain was not examined. Dr. Ringer testified that he remembered being asked why Jessica's eyes were taken. However, assuming for purposes of argument, that Dr. Ringer stated he did not know why Jessica's brain was not examined during the autopsy, the magistrate finds that since Dr. Ringer limited the autopsy, he should have known that he limited the autopsy, and that when asked, he should have explained why he limited the autopsy at that time. The first element of fraud is met.

**Was the representation that he did not know why the autopsy was limited material to the transaction at hand?**

{¶180} The magistrate finds that Daniel Siegel's question about why the brain was not examined was material to Daniel Siegel's questions about why Jessica died. The second element has been met.

**Was Dr. Ringer's representation that he did not know why a complete autopsy was not conducted made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred?**

{¶181} The magistrate finds that assuming Daniel Siegel asked Dr. Ringer why the brain was not examined, and Dr. Ringer stated he did not know, that would have been a false statement because Dr. Ringer limited the autopsy himself. The third element has been met.

**Was Dr. Ringer's representation that he did not know why a complete autopsy was not conducted made with the intent of misleading another into relying upon it?**

{¶182} The Siegels have not stated what they think Dr. Ringer intended to mislead them into relying upon when he stated that he did not know why the brain was not examined. The meeting took place on January 17, 2008, one year, four months, three weeks, and four days after Jessica died. By that date, the Siegels knew that Jessica had died after a brain surgery that Dr. Ringer had performed, they knew that they had given permission for a complete autopsy, and they knew that the autopsy report showed that the brain was not examined. The Siegels also had actual knowledge of the statutes of limitations for both a medical malpractice claim, which, by the time of the meeting with Dr. Ringer had expired, and a wrongful death claim, which, by the time of the meeting had not expired. The Siegels have not stated why Dr. Ringer's statement that he did not know why the brain was not examined would affect their decision to file either a medical malpractice or wrongful death claim based upon Dr. Ringer's medical treatment of Jessica. This element has not been met.

**Justifiable reliance upon the representation or concealment?**

{¶183} The magistrate finds that even if Dr. Ringer intended to mislead Daniel Siegel into relying on his statement that he did not know why the brain was not examined, it would not be reasonable to rely on that statement as a justification to not timely file a lawsuit against Dr. Ringer for his care and treatment of Jessica. Again, the Siegels knew that Dr. Ringer had performed brain surgery on Jessica in August 2006; they knew that she had died in August 2006; they possessed a copy of the autopsy in December 2006 that stated that no permission was given for removal of the brain despite knowing that they had given permission for her brain to be examined; they had a copy of Jessica's medical records which included the "scratched out" copy of the authorization for autopsy with Dr. Ringer's signature on it; and they had been advised of the applicable statutes of limitations for medical malpractice and wrongful death claims by experienced attorneys. By the date of the meeting with Dr. Ringer, the statute of limitations for a medical

malpractice claim had expired, but there was still time to file a wrongful death action. Whether or not the brain was examined did not affect the statute of limitations to file a claim regarding Dr. Ringer's care of Jessica. The magistrate finds that it was not justifiable to rely on Dr. Ringer's statements at the January 17, 2008 meeting to delay the filing of either a medical malpractice or wrongful death lawsuit regarding Dr. Ringer's care of Jessica. Therefore, the magistrate finds that plaintiffs have not proven justifiable reliance upon any representation or concealment that Dr. Ringer made in the January 17, 2008 meeting. This element is not met.

### A resulting injury proximately caused by the reliance?

{¶184} The injury to the Siegels was Jessica's death on August 23, 2006. Any statement made by Dr. Ringer on January 17, 2008, would have no bearing on whether they timely filed their claims for medical malpractice or wrongful death based on his care and treatment of Jessica. This element has not been met.

{¶185} In summary, the magistrate finds that plaintiffs have failed to prove that the lack of an autopsy of Jessica's brain prevented them from timely filing a medical malpractice or wrongful death claim. Because those cases were not filed timely, any damages relating to Jessica's death are not recoverable. Plaintiffs have not proven by a preponderance of the evidence that the lack of an autopsy of the brain disrupted their case, or that they justifiably relied on any representation or concealment of fact made by Dr. Ringer.

## Statute of Limitations in the Court of Claims

{¶186} Lastly, R.C. 2743.16(A) states, in relevant part: "civil actions against the state permitted by sections 2743.01 to 2743.20 of the Revised Code shall be commenced no later than two years after the date of accrual of the cause of action or within any shorter period that is applicable to similar suits between private parties." As the Tenth District Court of Appeals has stated: "Although the Siegels did not view the autopsy report immediately after receiving it in December 2006, to exercise reasonable diligence would have been to read the autopsy report near the time it was received." *Siegel v. State*, 2020-Ohio-4708, ¶ 36. The Tenth District Court of Appeals found that the Siegels' claim

for breach of contract based upon the autopsy report accrued in December 2006, when they received the autopsy report. The Tenth District Court of Appeals stated, "it would have been apparent to the Siegels that the contract had been breached or otherwise not fulfilled when the autopsy report showed that Jessica's head and brain had not been examined. (Autopsy Report at 1-2)." *Id.*, ¶ 36.

{¶187} R.C. 2305.09(E) states: "If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, *if it is for fraud, until the fraud is discovered.*" (Emphasis added.) "The 'discovery rule' generally provides that a cause of action accrues for purposes of the governing statute of limitations at the time when the plaintiff discovers *or, in the exercise of reasonable care, should have discovered the complained of injury.*" (Emphasis added.) *Investors REIT One v. Jacobs*, 46 Ohio St.3d 176, 179 (1989). The magistrate finds that plaintiffs' claims for fraud and spoliation accrued at the latest, in December 2006, because by that time, they had a copy of the autopsy report which showed that no examination of the head and brain had occurred. The Siegels knew that they had given permission for examination of the brain, and they expected a complete autopsy. The magistrate finds that to exercise reasonable care, plaintiffs should have discovered that Jessica's brain and head had been excluded from the autopsy in December 2006. The evidence presented at trial shows that plaintiffs did, in fact, review the autopsy report when it was provided in December 2006, and they had questions about why Jessica's eyes were taken and why her brain was not examined. The Siegels discovered that the head and brain had not been examined in December 2006 and that is why they sought legal advice. The "complained of injury" was the lack of an examination of the brain. The magistrate finds that plaintiffs' fraud and spoliation claims accrued in December 2006. Plaintiffs filed their claims in this court on December 16, 2009, more than two years after the date of the accrual of their causes of action. Upon review of the evidence that is now in the record, the magistrate finds that all of plaintiffs' claims are barred by the applicable statutes of limitations. The magistrate further finds that plaintiffs have failed to prove any of their claims by a preponderance of the evidence. Judgment is therefore recommended in favor of defendant.

{¶188} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

HOLLY TRUE SHAVER
Magistrate

**Filed September 4, 2024**
**Sent to S.C. Reporter 10/14/24**